Brad P. Miller, ISB No. 3630
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone: (208) 344-6000
Facsimile: (208) 342-3829
Email: bpm@hteh.com

John B. Massopust
Dan Millea
ZELLE HOFMANN VOELBEL & MASON LLP
500 Washington Avenue South, Suite 4000
Minneapolis, MN  55415
Telephone: (612) 339-2020
Facsimile: (612) 336-9100

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| DENNIS KOYLE, CHARLES K. TURNER, and THE HARRIS RANCH, on behalf of themselves and all others similarly situated, | ) ) ) ) | Case No. CIV-01-0286-S-BLW |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION** |
| LEVEL 3 COMMUNICATIONS, INC., a Delaware Corporation, LEVEL 3 COMMUNICATIONS, LLC, a Delaware Limited Liability Corporation, and LEVEL 3 TELECOM HOLDINGS, INC., a Delaware Corporation, | ) ) ) ) ) ) | **[DOCKET #177] FOR SUMMARY JUDGMENT** |
| Defendants. | ) ) | |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.      Level 3's Superficial Analysis Of The Case Law And Statutory History
Related To The 1875 Act Is Simply Wrong .................................................. 2

      A.      It Is *Stare Decisis* That The Railroad Obtained Only A Surface
Easement Under The 1875 Act, And Level 3's Contention That The
Railroad Can Nonetheless Do As It Pleases Because Its Interest Is
"Absolute As That Of An Owner In Fee" Is Contradicted By A Wealth
Of Authority ...................................................................................... 3

      B.      The Incidental Use Doctrine Does Not Support Level 3's Position ..................... 9

            1.      Under The Incidental Use Doctrine The Non-Railroad Use
Must Be Incidental To A Railroad Use, Which Is The Opposite
Of What Exists Here .................................................................... 9

            2.      The Railroads' Rights To Use The Rights Of Way Were
Restricted To "Railroad Purposes" In The Grants Themselves .............. 14

            3.      The Supreme Court, Federal Courts, And The Interior
Department Have Ruled That The Railroads May Only Use
The Rights Of Way For Railroad Purposes .............................................. 15

            4.      Commercial Telephone, Telegraph And Fiber-Optic Lines
Exceed The Scope Of Railroad Easements .............................................. 17

            5.      The Various Cases Cited By Level 3 For The Proposition That
Commercial Fiber-Optic Cable Constitutes An "Incidental
Use" Are Inapposite ......................................................................... 20

      C.      Level 3's Contention That Idaho Law Allows The Installation Of Its
Fiber-Optic Cable Irrespective Of Plaintiffs' Land Rights Is Contrary
To The Idaho And U.S. Constitutional Protections Against
Government Takings Without Just Compensation ............................................... 24

      D.      Level 3's Argument That Any Right-Of-Way Interest Not Granted To
The Railroads Now Resides In The United States Government Is
Patently Wrong .................................................................................. 25

            1.      The Well-Reasoned *Hash, Brown* and *Home on the Range*
Decisions Expose Level 3's Erroneous Interpretation Of Prior
Statutes And Case Law .................................................................... 26

            2.      The Twentieth Century Statute Relied On By Level 3 Is
Curative In Nature, And Is Not Indicative Of Congress'
Original Intent In The Railroad Land-Grant Statutes ............................... 31

i

3.    The Cases Cited By Level 3 Do Not Support The Conclusion That The United States Retained A Fee Or Reversionary Interest In The Servient Estate Underlying The Railroad Rights Of Way ................................................................................ 33

4.    Even The United States Government Has Abandoned Any Claim To A Reversionary Interest In The Fee Underlying 1875 Act Rights Of Way ................................................................ 34

II.    The Court Should Deny Level 3's Requested Summary Judgment With Respect To All Class members Who Did Not Own Their Property When The Cable Was Installed Because The Trespass At Issue Is A Continuing Trespass And Level 3's Unjust Enrichment Is Ongoing ................................................ 35

A.    Level 3's Use Of The Cable For Commercial Purposes Is A Continuing Trespass ........................................................ 36

1.    A Trespass That Results From Unsanctioned And Abatable *Use* Of A Plaintiff's Land Is A Continuing Trespass ........................... 37

B.    Level 3's Unjust Enrichment Is Continuing ....................................... 42

CONCLUSION ................................................................ 42

## TABLE OF AUTHORITIES

**Page**

**Cases**

*509 Sixth Ave. Corp. v. N.Y. City Transit Auth.*, 203 N.E.2d 486 (N.Y. 1964) .......................... 38

*Agostini v. N. Adams Gaslight Co.*, 163 N.E. 745 (Mass 1928) ................................. 18

*Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865 (1999) ................................. 29

*Anderson v. Interstate Mfg. Co.*, 132 N.W. 812 (Iowa 1911) ................................. 12

*AT&T  v. Pearce*, 18 A. 910 (Md. 1889) ................................. 17

*Bailey v. Sweeney*, 9 A. 543 (N.H. 1887) ................................. 12

*Barden v. N. Pacific R.R. Co.*, 154 U.S. 288 (1894) ................................. 15

*Beres v. United States*, 64 Fed. Cl. 403. 425 (Fed. Ct. 2005) ................................. 28, 29

*Blalock Eddy Ranch v. MCI Telecomms. Corp.*, 982 F.2d 371 (9th Cir. 1992) ................. 37

*Boesche v. Udall*, 373 U.S. 472 (1963) ................................. 29

*Boise Valley Constr. Co. v. Kroeger*, 105 P. 1070 (Idaho 1909) ........................... 37, 41

*Boyd v. Pierce*, 644 S.W.2d 927 (1983) ................................. 23

*Brown v. N. Hills Reg'l R.R. Auth.*, 732 N.W.2d 732 (S.D. 2007) ........................... 29

*Buhl v. U.S. Sprint Commc'ns Co.*, 840 S.W.2d 904 (Tenn. 1992) ................. 19, 22, 24

*Burke v. S. P. R. Co.*, 234 U.S. 669 (1914) ................................. 29

*Butler v. Lindsey*, 361 S.E.2d 621 (S.C. Ct. App. 1987) ................................. 38

*Cacioppo v. Sw. Bell Telephone Co.*, 550 S.W.2d 919 (Mo. Ct. App. 1977) ............... 38

*Canadian Pac. Ry. Co. v. Moosehead Tel. Co.*, 76 A. 885 (Me. 1910) ................. 18, 25

*Chambers v. Great N. Power Co.*, 110 N.W. 1128 (Minn. 1907) ........................... 18

*Chicago & N.W. Ry. Co. v. Thompson*, 127 F.2d 1001 (7th Cir. 1942) ............... 12, 33

*Chicago, B. & Q. R. Co. v. City of Chicago*, 166 U.S. 226 (1897) ........................... 24

*Citizens' Tel. Co. v. Cincinnati, N.O. & T.P. R. Co.*, 233 S.W. 901 (Ky. 1921) ............ 18

*Coleman v. Mo. Pac. R.R. Co.*, 745 S.W.2d 622 (Ark. 1988) ........................... 23

*Curtis v. Norfolk S. Ry. Co.*, No. 1:01CV00869, 2003 WL 1965467 (M.D.N.C. Apr. 11, 2003) ................................. 41

*Dickman v. Madison County Light & Power Co.*, 136 N.E. 790 (Ill. 1922) ............... 18

*Energy Transportation Systems, Inc. v. Union Pacific R.R. Co.*, 606 F.2d 934 (10th Cir. 1979) ................................. 7

*Energy Transportation Systems, Inc. v. Union Pacific R.R. Co.*, 619 F.2d 696 (8th Cir. 1980) ................................. 7

*Fradkin v. Northshore Util. Dist.*, 977 P.2d 1265 (Wash. Ct. App. 1999) .................................. 38

*Gasperson v. Sprint Commc'ns Co.*, No. 96-1940, 1997 WL 770931 (4th Cir. Dec. 16, 1997) .......................................................................................................................... 41

*Genenbacher v. Centurytel Fiber Co.*, 500 F. Supp. 2d 1017 (C.D. Ill. 2007) ........................... 41

*Gordy Const. Co. v. KHM Dev. Co., Inc.*, 197 S.E.2d 426 (Ga. Ct. App. 1973) ................. 37, 40

*Grand Trunk R.R. Co. v. Richardson*, 91 U.S. 454 (1875) ........................................................ 10

*Great N. Ry. Co. v. Steinke*, 261 U.S. 119, 124 (1923) ................................................................ 14

*Great N. Ry. Co. v. United States*, 315 U.S. 262 (1942) .......................................................... 4, 5

*Gross v. Capital Elec. Line Builders, Inc.*, 861 P.2d 1326 (1993) ............................................ 40

*Gurney v. Minneapolis Union Elevator Co.*, 65 N.W. 136 (Minn. 1895) .................................. 12

*H. A. & L. D. Holland Co. v. Northern Pac. Ry. Co.*, 214 F. 920 (9th Cir. 1914) ..................... 11

*Hall v. Bowers*, 222 N.W. 40 (Neb. 1928) ................................................................................. 12

*Hamilton v. Annapolis & E.R. R.R. Co.*, 1852 WL 3036 (Md. June 1852) ................................ 12

*Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005) ...................................................... 26, 28

*Hastings & Dakota R.R. Co. v. Whitney*, 132 U.S. 357 (1889) ................................................. 29

*Hegg v. Hawkeye Tri-County REC*, 512 N.W.2d 558 (Iowa 1994) ............................................ 37

*Hodges v. W. Union Tel. Co*, 45 S.E. 572 (N.C. 1903) ......................................................... 13, 18

*Home on the Range v. AT&T Corp.*, 386 F. Supp. 2d 999 (S.D. Ind. 2005) ......... 1, 19, 20, 30, 31

*Hynek v. MCI World Commc'ns, Inc.*, 202 F. Supp. 2d 831 (N.D. Ind. 2002) ..................... 20, 21

*Idaho v. Oregon Short Line R.R. Co.*, 617 F.Supp. 207 (D. Idaho 1985) ............... 8, 9, 26, 31, 33

*Ill. Central R.R. Co. v. Wathen*, 1885 WL 8476 (Ill. App. Ct. Dec. 1885) ................................ 14

*In re Worldcom, Inc.*, 546 F.3d 211 (2d Cir. 2008) ................................................................... 40

*Int'l Paper Co. v. MCI Worldcom Network Servs., Inc.*, 442 F.3d 633 (8th Cir. 2006) ............................................................................................................................................. 40

*Int'l Paper Co. v. MCI Telecomms., Corp.*, 202 F. Supp. 2d 895 (W.D. Ark. 2002) .......................................................................................................................................... 20, 22, 23

*Jacques v. Pioneer Plastics, Inc.*, 676 A.2d 504 (Me. 1996) .................................................... 38

*Johnson v. Kan. City S. Ry. Co.*, No. 05-60372, 2006 WL 3371772 (5th Cir. Nov. 21, 2006) ................................................................................................................................... 41

*Joseph A. Neyrey, Gen. Contractor, Inc. v. La. Power & Light Co.*, 347 So. 2d 266 (La. Ct. App. 1977) .............................................................................................................. 38

*Kirkman v. Norfolk S. Ry. Co.*, No. 1:01CV00850, 2006 WL 544303 (M.D.N.C. Mar. 6, 2006) .............................................................................................................................. 41

*Klump v. MCI Telecomms. Corp.*, No. 4:01-CIV 01-421 ACM, 2003 WL 24296629 (D. Ariz. Mar. 25, 2003) .......................................................................... 20, 21, 31

*Knapp & Cowles Mfg. Co. v. N.Y., New Haven & Hartford R.R. Co*, 56 A. 512 (Conn. 1903) .................................................................................................. 37

*Leo Sheep Co. v. United States*, 440 U.S. 668 (1979) ................................ 29

*Louisville & Nashville R.R. Co. v. Maxey*, 77 S.E. 801 (Ga. 1913) ........... 12

*Lutyen v. Ritchie*, 218 P. 430 (Idaho 1923) ............................................... 42

*MacDonald v. United States*, 119 F.2d 821 (9th Cir. 1941) .................... 7,8

*Marshall v. Chicago & Nw. Transp. Co.*, 31 F.3d 1028 (10th Cir. 1994) ... 33

*Mellon v. S. Pac. Transp. Co.*, 750 F. Supp. 226 (W.D. Tex. 1990) ....... 20, 21

*Mich. Cent. Ry. Co. v. Bullard*, 79 N.W. 635 (Mich. 1899) ..................... 12

*Midland Valley R.R. Co. v. Sutter*, 28 F.2d 163 (1928) ............................ 9

*Miss. Invs., Inc. v. New Orleans & Ne. Ry. Co.*, 188 F.2d 245 (5th Cir. 1951) .......... 12

*Missouri-Kansas-Texas R.R. Co. v. Freer*, 321 S.W.2d 731 (Mo. Ct. App. 1958) ....... 23

*Mitchell v. Illinois Cent. R.R.*, 51 N.E.2d 271 (Ill. 1943) ......................... 12

*Mock v. Potlatch Corp.*, 786 F. Supp. 1545 (D. Idaho 1992) .................... 39

*Mountain States Tel. & Tel. Co. v. Kelly*, 459 P.2d 349 (Idaho 1969) ...... 25

*Muncie Elec. Light Co. v. Joliff*, 109 N.E. 433 (Ind. Ct. App. 1915) ...... 12, 18

*N. States Power Co. v. Franklin*, 122 N.W.2d 26 (Minn. 1963) ............... 38

*Nashville, C. & St. L. Ry. Co. v. Karthaus*, 43 So. 791 (Ala. 1907) ......... 12

*New Mexico v. U.S. Trust Co.*, 172 U.S. 171 (1898) ................................. 8

*N.Y. N.H.&H. Ry. Co. v. Armstrong*, 102 A. 791 (Conn. 1918) .............. 12

*N. Pacific Ry. Co. v. Townsend*, 190 U.S. 267 (1903) ................... 4-6, 9, 32-33

*Ore. Short Line R.R. Co. v. Ada Cty.*, 18 F. Supp. 842 (S.D. Idaho 1937) .......... 12

*Peeler v. MCI, Inc.*, 447 F.3d 992 (7th Cir. 2006) ................................... 41

*People v. Eaton*, 59 N.W. 145 (Mich. 1894) ............................................. 25

*Phillips v. Postal Tel. Cable Co.*, 41 S.E. 1022 (N.C. 1902) ................. 18, 24

*Pittock v. Cent. Dist. & Printing Tel. Co.*, 1906 WL 3819 (Pa. Super. Ct. May 10, 1906) .......... 18

*Rio Grande Western Railway v. Stringham*, 239 U.S. 44 (1915) ............... 5

*Ritter v. Thompson*, 144 S.W. 910 (Ark. 1912) ........................................ 23

*Ritz v. Indiana & Ohio R.R., Inc.*, 632 N.E.2d 769 (Ind. Ct. App. 1994) .... 21

*Rogers v. Ore.-Wash. R.R. & Navigation Co.*, 156 P. 98 (Idaho 1916) ...... 37

*Santa Fe Pacific R.R. Co.*, 27 Pub. Lands Dec. 649 (1898) ...................... 16

*SW. R. Co. v. S. & Atl. Tel. Co.*, 1872 WL 2649 (Ga. July 1872) ............. 25

*Sparrow v. Dixie Leaf Tobacco Co.*, 61 S.E.2d 700 (N.C. 1950) .................................... 10, 11, 21

*St. Louis, I.M. & S. Ry. Co. v. Cape Girardeau Bell Tel. Co.*, 114 S.W. 586 (Mo. Ct. App. 1908) ........................................................................................................... 18

*St. Louis-San Francisco Ry. Co. v. White*, 132 S.W.2d 807 (Ark. 1939) ...................................... 23

*State ex rel. Evans v. Spokane Int'l R.R. Co.*, 579 P.2d 694 (Idaho 1978) ................................. 36

*Sturgeon v. Wabash*, 17 S.W.2d 616 (Mo. Ct. App. 1929) ......................................... 12

*Swendig v. Wash. Water Power Co.*, 265 U.S. 322 (1924) ........................................ 29

*United States v. Hess*, 194 F.3d 1164 (10th Cir. 1999) ............................................. 37

*United States v. Marvin M. Brandt Revocable Trust*, No. 06-CV-184-J, 2008 WL 7185272 (D. Wyo. Apr. 8, 2008) ..................................................................................... 34

*United States v. Schurz*, 102 U.S. 378, 402 (1880) ...................................................... 29

*United States v. Union Pacific Railroad Co.*, 353 U.S. 112 (1957) ......................................... 5, 16

*Vieux v. East Bay Regional Park District*, 906 F.2d 1330 (9th Cir. 1990) ................. 8, 26, 31, 34

*W. Union Tel. Co. v. Nashville, C. & St. L. Ry Co.*, 237 S.W. 64 (Tenn. 1921) ........................ 18

*Ward v. McGlory*, 265 N.E.2d 78 (Mass. 1970) ................................................. 38

*Waterman S.S. Corp. v. United States*, 381 U.S. 252 (1965) ...................................... 31

*Watt v. W. Nuclear, Inc.*, 462 U.S. 36 (1983) ................................................ 29

*Weir v. Standard Oil Co.*, 101 So. 290 (Miss. 1924) ................................................. 12

*West v. Worldcom, Inc.*, No. 06 Civ. 0748(WHP), 2007 WL 3407060 (S.D.N.Y. Nov. 14, 2007) .............................................................................................................. 40

*Western Union Tel. Co. v. Pa. R.R. Co.*, 195 U.S. 540 (1904) ...................................... 8

*Whipps Land Cattle Co. v. Level 3 Commc'ns, LLC*, 658 N.W.2d 258 (Neb. 2003) ............................................................................................................................................ 31

## Other Authorities

28 U.S.C. § 1295 ................................................................................................... 26

43 C.F.R. § 2842(a) ............................................................................................... 27

43 U.S.C.A. § 940 .................................................................................................... 8

*Black's Law Dictionary* (6th ed. 1993) .......................................................... 22

General Railroad Right of Way Act, 18 Stat. 482, codified at 43 U.S.C. § 934. ............... passim

Idaho Const., art. I, § 14 ......................................................................................... 24

*Ownership of Minerals Beneath Land Grant Act Right-of-Way Northern Pacific R.R. Co.*, 58 Interior Dec. 160 (1942) ................................................................... 16, 17

The Act of March 8, 1922, 42 Stat. 414, 43 U.S.C. § 912 ................................. passim

U.S. Const., amend. V ............................................................................................................ 24

*Use of Railroad Right of Way for Extracting Oil*, 56 Interior Dec. 206 (1937) .......................... 16

## <u>INTRODUCTION</u>

In Defendants' Brief In Support of Motion for Summary Judgment ("Level 3 Br.") (Docket # 177-1), Level 3 attempts to throw the proverbial "kitchen sink" at the Court, superficially addressing a number of issues and hoping that one will carry the day. A thorough examination of each argument reveals that Level 3's positions are meritless and its motion must be denied.

Level 3 argues that under the General Right of Way Act of 1875, Union Pacific is essentially a fee owner (even though Level 3 admits the railroad can only hold an easement under the Act). Next, Level 3 argues that even as a mere easement holder, Union Pacific is allowed to grant another corporation that has no connection with railroad business the right to install a nationwide fiber network for commercial use, because such use – which represents the very reason the Level 3 corporation came into existence – is merely "incidental." Further, Level 3 argues – contrary to decisions directly on point – that whatever rights Union Pacific does not own were retained by the United States so the class members have no claim, despite the fact that the government patented out to Idaho homesteaders full fee simple title to the land. None of these arguments withstands scrutiny and should be rejected just as they have been by other federal courts, including the Southern District of Indiana in a detailed 2005 decision that is directly on point. *Home on the Range v. AT&T*, 386 F. Supp. 2d 999 (S.D. Ind. 2005).

Level 3 then turns to a separate, and inherently contradictory argument, that its installation of fiber-optic cable and conduit in 2000 was a permanent trespass such that any class members who did not own the land at the time of the installation have no legal claims. The trespass, however, did not occur merely because fiber-optic cable and conduit was installed. Level 3 argues in support of its flawed "incidental use" argument that if Union Pacific were using the fiber solely for the safe and efficient operation of the railroad, that would constitute a

railroad purpose and such conduct would not be a trespass.  Whatever the merit of that claim, the trespass at issue here relates to the conduct of Level 3 in utilizing a fiber-optic network for commercial purposes from 2000 to the present, without obtaining the permission of the landowners or paying for the right to continue using the network for such non-railroad purposes. While a sole use by Union Pacific might fall within the scope of the railroad's easement under the 1875 Act, the continuing, offending use by Level 3 plainly does not, and that use constitutes a continuing trespass.

Finally, Level 3's argument that Plaintiffs' claims for declaratory and injunctive relief fail under governing Idaho law is without merit and is contrary to the Idaho and United States Constitutions.[1]

## ARGUMENT

**I.      Level 3's Superficial Analysis Of The Case Law And Statutory History Related To The 1875 Act Is Simply Wrong.**

The General Railroad Right of Way Act of 1875 is one of several federal statutes establishing property rights in railroad rights of way.  These statutes are commonly referred to as "land grant" statutes, since many of them involved outright grants of section lands to the railroads.  The 1875 Act, however, granted no land, but only easement rights to the railroads. The United States Supreme Court has explicitly confirmed that only railroad easements were

---

[1] Level 3 also argues that Plaintiffs' deeds do not include an interest in the rights of way adjoining several of their parcels.  Level 3 Br. at 20-23.  Plaintiffs will address that argument in Plaintiffs' reply brief in support of Motion for Summary Judgment on the Centerline Presumption as that issue was addressed in Plaintiffs' opening summary judgment brief on the centerline presumption issue. *See* Docket # 176.  The parties met and conferred prior to filing their respective motions for summary judgment, to avoid duplicative filings.  Accordingly, the Class Representatives did not file their own motion for summary judgment on issues related to the General Right of Way Act of 1875, but the denial of Level 3's motion will confirm the Class is entitled to partial summary judgment.  In effect, this opposition serves the same function as a cross-motion.

conveyed.  Level 3's claim that the railroad's property interest in the rights of way crossing over the Plaintiffs' property are, nonetheless, "as absolute as the owner of a fee" is ridiculous, for if that were true the Supreme Court's controlling decision would be rendered meaningless.

In addition, both before and after the 1875 Act, the United States issued patents to homesteaders for section lands over which the railroad routes were built, including the Union Pacific route in Idaho.  Numerous Supreme Court decisions have established that these homesteaders received all rights not specifically reserved by the government, meaning they became the fee owners of the section lands, including the land beneath the railroad easements.

Furthermore, although railroad easements allow the holder to use the surface easement to operate its rail line without interference from the underlying fee owners, the use of the right of way is limited to railroad purposes, and a long line of federal decisions holds that *commercial* telecommunications use is not within the scope of an easement for railroad purposes.

None of Level 3's attempts to escape the impact of these three fundamental truths withstands scrutiny.  An exploration of the full history of the relevant statutes and case law demonstrates the flaws in Level 3's arguments.

A.   **It Is *Stare Decisis* That The Railroad Obtained Only A Surface Easement Under The 1875 Act, And Level 3's Contention That The Railroad Can Nonetheless Do As It Pleases Because Its Interest Is "Absolute As That Of An Owner In Fee" Is Contradicted By A Wealth Of Authority.**

On March 3, 1875, Congress passed the General Railroad Right of Way Act, 18 Stat. 482, codified at 43 U.S.C. § 934.  In the 1875 Act, Congress decided to end its practice of responding to individual requests for specific railroad projects, and instead passed a "general" act for western railroad construction.  The heart of the Act was a provision for the creation of "the right of way" for any qualifying railroad.  The Act provided "all such lands over which such right-of-way shall pass shall be disposed of subject to such right-of-way."  *Id.* at § 4.  Finally,

unlike earlier railroad grants, there was no provision for any land grant or subsidy, largely due to a public backlash against such lavish giveaways to the railroads.  *See Great N. Ry. Co. v. U.S.*, 315 U.S. 262, 274 (1942).

The Supreme Court conclusively ruled in *Great Northern*, 315 U.S. 262 (1942) that railroad rights of way created under the 1875 Act are easements, not estates in fee simple.  That much is *stare decisis,* and is conceded by Level 3. Level 3 Br. at 4.   Nonetheless, Level 3 pretends that this fact is meaningless because such easement rights are "as absolute as the owner of a fee."  *Id*. at 3-5.   However, a review of the land grant case law proves that the railroad's interest in the rights of way crossing over the Plaintiffs' property[2] is what the Supreme Court said it was -- an easement and not the equivalent of a fee.

The source of Level 3's erroneous argument lies in a series of decisions in the early part of the last century in which the courts described certain land grant statutes as granting a "limited fee," a concept that subsequently confused the issues in later analyses.  In *Northern Pacific Railway Co. v. Townsend*, 190 U.S. 267 (1903), for example, landowners asserted rights by adverse possession over a portion of a right of way which had been granted by the Northern Pacific Act of 1864.  Ruling that the right of way could not be acquired by adverse possession, the Court noted that the grant by Congress was limited to a very specific purpose, "which negated the existence of a power to voluntarily alienate the right of way or any portion thereof." *Id.* at 271.  Thus, the Court concluded that:  "In effect the grant was of a limited fee, made on implied condition of reverter if the company ceased to use or retain the land for the purpose for

---

[2] Plaintiffs object to Level 3's characterization in the Defendants' Statement of Facts in Support of Defendants' Motion for Summary Judgment that its fiber-optic cables were installed within railroad rights of way "adjacent to property" owned by the Plaintiffs.  *See* Docket # 177-2 at 5. Plaintiffs own the subsurface underlying the rights of way in fee simple.  Accordingly, the railroad rights of way cross Plaintiffs' property.

which it was granted." *Id.* In *Rio Grande Western Railway v. Stringham*, 239 U.S. 44 (1915), the Court used the limited fee concept again, this time in reference to the 1875 Act. Subsequent courts also adopted the *Townsend* "catch-phrase" "limited fee."

In *Great Northern*, the United States sought to enjoin Great Northern Railway Company from drilling for gas or oil under its right of way created pursuant to the 1875 Act. 315 U.S. at 270. The Court engaged in a very precise analysis and construction of the 1875 Act, first noting that, under § 1 of the Act, "the right is one of passage since it grants 'the,' not 'a' right-of-way through the public lands of the United States." *Id.* at 271. Justice Murphy then went on to buttress the statutory analysis and conclusion with a history of federal land grant legislation. The Court found that after 1871 there was considerable public opposition to outright grants of federal public lands for subsidizing railroads. *Id.* at 274. Several railroad acts were passed simply granting a right of way, without a land subsidy. *Id.* The Court cited several examples from the legislative debates in which sponsoring congressmen clarified that the legislation involved only a grant of right of way, and not a grant of land. *Id.* Based on this legislative history, as well as its analysis of the 1875 Act, the Court specifically overruled its earlier decision in *Stringham* and held that a right of way created by the 1875 Act should be construed as the grant of an easement and not a fee. *Id.* at 279.

In *United States v. Union Pacific Railroad Co.*, 353 U.S. 112 (1957), the Court was again called upon to decide whether a railroad could drill for oil under its right of way, this time under the Pacific Railroad Act of 1862. The United States claimed that the right of way granted by the 1862 Act did not include mineral rights. *Id.* at 113. The Court first focused on the 1862 statutory grant of the right of way to Union Pacific:

> On the face of the Act it would seem that the use of the words "the right of way" describes a lesser interest than the grant of "public land." [*i.e.,* section 3]

5

> Moreover, this right-of-way was granted Union Pacific "for the construction of said railroad and telegraph line." § 2. **That purpose is not fulfilled when the right of way is used for other purposes.** It would seem that, whatever may be the nature of Union Pacific's interest in the right of way, drilling for oil on or under it is not a railroad purpose within the meaning of Section 2 of the Act.

*Id.* at 114 (citing *Townsend*, 190 U.S. at 271) (emphasis added).

The Court later dealt with the railroad's argument based on *Townsend*, *Stringham*, and other older Supreme Court cases which had applied the "limited fee" concept. Dismissing the applicability of these cases, Justice Douglas said: "The most that the 'limited fee' cases decided was that the railroads received all surface rights to the right‑of‑way and all rights incident to a use for railroad purposes." *Id.* at 119.

Taken together, *Great Northern* and *Union Pacific* had two major consequences. The first was that the "limited fee" concept articulated in the earlier Supreme Court decisions in no way created a right to subsurface use, since Justice Murphy held in *Great Northern* that rights of way created pursuant to the 1875 Act were easements only, and Justice Douglas in *Union Pacific* noted that the phrase was simply intended to clarify that a land grant right of way was confined to surface rights for railroad purposes and related incidental rights.

The second consequence of the two cases was a recognition that the creation of railroad rights of way over public lands had the effect of legally separating rights over the surface of the land from rights underneath the surface. This means that at the moment the land grant right of way became effective, the railroad easement (or the right to use the surface for railroad purposes) was transferred to the railroad, whereas title to the underlying fee remained in the United States. Ownership of the subsurface fee then passed to homesteaders as the West was settled and patents were issued.[3]

---

[3] Any possible doubt concerning the legal character of a railroad right of way created pursuant to land-grant legislation was laid to rest by the *ETSI* cases, where both the Eighth and Tenth Circuit

In the face of this authority, Level 3 quotes *MacDonald v. United States*, 119 F.2d 821, 824 (9th Cir. 1941) and claims that *MacDonald* defines how the Ninth Circuit views property interests conveyed by the 1875 Act.  *See* Level 3 Br. at 3.  Level 3 ignores the key fact that *MacDonald* **preceded** the Supreme Court's seminal decisions in *Great Northern* (1942) and *Union Pacific* (1957).  However, even without the benefit of those controlling decisions, the *MacDonald* court's analysis was essentially consistent with the law announced by the Supreme Court in 1942 and 1957, but Level 3 utterly misrepresents the *MacDonald* opinion.

The language Level 3 quotes – "as absolute as that of an owner in fee" – does not describe rights of way conveyed specifically by the 1875 Act, but, rather, is taken from the court's "passing discussion" of the general nature of railroad rights of way.  *See MacDonald*, 119 F.2d at 824.  Later in this same discussion the court went on to note that, "[m]ost of the modern decisions [regarding railroad rights of way] in the states go no farther than to recognize an exclusive easement or a qualified fee *in the surface*."  *Id.* (emphasis added).

When the *MacDonald* court did specifically discuss the nature of the interest conveyed by the 1875 Act, the court stated, "the general act of 1875 was intended as granting no more than a right of passage."  *Id.* at 826.  Looking at the language of the act, the court unequivocally stated

---

Courts of Appeal held that the landowners along the railways, not the railroads, own the soil underlying the rights of way.  Energy Transportation Systems, Inc. attempted to construct a coal slurry pipeline, 1,386 miles in length, in a north-south direction, and obtained from the landowners who owned the servient soil the right to excavate and place the pipelines under the rights of way.  In *Energy Transportation Systems, Inc. v. Union Pacific Railroad Co.*, 606 F.2d 934 (10th Cir. 1979), the Tenth Circuit, affirming decisions by the District Courts of Wyoming and Kansas, held that the 1862 land-grant legislation did not separate the servient estate underlying railroad rights of way from the public domain, because the railroad received only a surface right of way.  *Id.* at 937.  Therefore, the landowners received title to the servient estate, subject to the right of way, by virtue of the Homestead Act.  *Id.* The Eighth Circuit reached precisely the same conclusions in *Energy Transportation Systems, Inc. v. Union Pacific Railroad Co.*, 619 F.2d 696 (8th Cir. 1980).  Citing the Tenth Circuit's decision with approval, the Court of Appeals concluded that the railroad's interest in the right of way was "limited to surface and other rights used in the construction and operation of the railroad."  *Id.* at 698-99.

that "apter words to indicate the intent to convey an easement would be difficult to find."  *Id.*
Additionally, the court cited a circular issued by the Department of Interior which stated that "the
act of March 3, 1875, is not in the nature of a grant of lands; it does not convey an estate in fee . .
. ."  *Id.*  Finally, the court noted that a federal statute, 43 U.S.C.A. § 940, provided "some value
in the interpretation of the 1875 grant" and that the statute referred to the grant as an easement.
*Id.*

The Ninth Circuit plainly does not view the railroad's interest in the rights of way granted
under the 1875 Act "as absolute as the owner of a fee"; rather it views those rights of way as
surface rights or mere "rights of passage" and easements.  That is why the court in *MacDonald*
affirmed judgment in favor of the United States and affirmed an injunction prohibiting the
railroad owning the rights of way at issue from extracting oil, gas, and minerals underlying those
rights of way.  *Id.* at  828.

Level 3 also cites *Vieux v. East Bay Regional Park District*, 906 F.2d 1330 (9th Cir. 1990)
and *Idaho v. Oregon Short Line Railroad Co.*, 617 F.Supp. 207 (D. Idaho 1985).  Level 3 Br. at
4.[4]  However, *Vieux* actually distinguishes between the rights obtained by railroads under the
1862 and 1864 land grant statutes and the "lesser interest" easements obtained under the
1875 Act. 906 F.2d at 1332-33.  Similarly, the *Oregon Short Line* court explicitly noted that
"Congress, in granting the 1875 Act rights-of-way, did not intend to convey to the railroads a fee
interest in the underlying lands."  617 F.Supp at 212.

---

[4] Level 3 also cites *New Mexico v. U.S. Trust Co.*, 172 U.S. 171 (1898) and *Western Union Tel.
Co. v. Pa. R.R. Co.*, 195 U.S. 540 (1904).  Level 3 Br. at 3-4.  *Western Union*, which did not
even involve a land grant statute, relies on references in *U.S. Trust Co.*, which involved an 1866
railroad charter statute.  That case was decided long before *Great Northern*, which eliminated
any argument that 1875 Act easements are fees, limited fees, or carry "the attributes of a fee."

Level 3 also contends that "easements granted to railroads by the 1875 Act are much broader than ordinary easements" as railroads under the 1875 Act have the right to exclusive use and occupancy of their rights of way.  Level 3 Br. at 4.  For this proposition, Level 3 relies upon *Oregon Short Line* and *Midland Valley Railroad Co. v. Sutter*, 28 F.2d 163, 166 (1928); however, the courts in these cases were simply discussing the railroad's right to exclusive use and possession of its *surface* rights of way, not to the *subsurface*.  *See Oregon Short Line*, 617 F. Supp. at 210-13; *Midland*, 28 F.2d at 165-67.[5]

Notwithstanding Level 3's overreach, it certainly is true that under 1875 Act railroad easements (as well as any other form of railroad easement), railroads have the right to exclusive use of the surface for railroad operations and can exclude interfering uses.  However, the issue in this case is not whether owners of the servient estate can interfere with the railroad's use of its surface easement, but whether the railroad and a third-party corporation can ignore the servient fee interest and install a commercial telecommunications network underground, in the servient fee soil.

**B.    The Incidental Use Doctrine Does Not Support Level 3's Position.**

     **1.    Under The Incidental Use Doctrine The Non-Railroad Use Must Be Incidental To A Railroad Use, Which Is The Opposite Of What Exists Here.**

The incidental use doctrine directs a court to evaluate the propriety of any use of a railroad right of way by asking whether the primary object of the use is to benefit the railroad.  If the "primary benefit" is to the railroad, the proposed use is considered to be a "railroad purpose,"

---

[5] As noted, the court in *Oregon Short Line*, relying upon *Great Northern Railway Co. v. United States*, 315 U.S. 262, 274 (1942) (discussed *supra* at 5-6), specifically recognized that that 1875 Act did not convey a fee interest to the land underlying the rights of way.  In doing so, the court recognized the confusion that *Townsend* and *Stringham* had created and rejected the hybrid concept of a fee simple interest and mere easement, calling it "rather unartful coinage."  *Oregon Short Line*, 617 F.Supp. at 210.

even if it results in an "incidental benefit" to a third party.  It is the **non-railroad** use that must be **incidental** to the primary railroad purpose – not the other way around.  Level 3 tries to reverse the doctrine, suggesting that as long as there is a railroad use associated with its fiber-optic cable, such an "incidental" use bootstraps Level 3's commercial purposes into the scope of Union Pacific's railroad easement.  Level 3 wants the railroad tail to wag the telecommunications dog, but that is simply not how the doctrine operates.

The seminal decision explaining the "incidental use doctrine" is *Grand Trunk Railroad Co. v. Richardson*, 91 U.S. 454 (1875).  In *Grand Trunk*, a railroad permitted a third party to use a warehouse within the railroad's right of way as a receiving dock and for lumber storage. Noting that the warehouse was used "for the receipt and delivery of freight on [the rail]road" and was not "inconsistent with the purposes for which [the railroad] charter was granted," the Supreme Court held:  "[W]e are not prepared to assert that [the railroad] may not license the erection of buildings [which are primarily] for its convenience, even though they may be also for the [incidental] convenience of others."  *Id.* at 468.

Many states have expressly adopted the incidental use doctrine as enunciated in *Grand Trunk*, and it has been consistently applied.  The North Carolina Supreme Court provided a particularly thorough explanation of the doctrine's parameters in *Sparrow v. Dixie Leaf Tobacco Co.*, 61 S.E.2d 700 (N.C. 1950), where the court held that a railroad's right-of-way lease to a tobacco company for a warehouse was not permitted because it did not primarily serve a railroad purpose:

> Ownership of the easement carries with it the right to use the property within the bounds of the right of way for any purpose the **primary object** of which is the furtherance of the business of the railroad.  So long as the use to which the easement is subjected comes within this rule, the owner of the servient estate has no cause to complain, for the grant of the easement was for such purpose and

constitutes a part of the dominant estate.  The use, however, must be reasonably necessary for or convenient to the operation of the railroad.

On the other hand, the railroad company possesses no right or authority to use or to let the property for private or nonrailroad purposes.  It cannot erect or permit the erection of warehouses, factories, and the like, not necessarily connected with the use of their franchise, within the limits of their right of way.  When property is taken for railroad purposes, the fee remains with the owner and, outside of the authorized use, the proprietary right is in the original owner.

* * *

When the use by third parties is ***primarily for the benefit*** of the railroad as a common carrier, then it is for railroad purposes even though ***incidental benefits*** flow to the private user.  On the other hand, if the use is ***primarily private*** in nature, the fact that the railroad is ***incidentally benefitted*** thereby, through the acquisition of a new customer or increased shipments, does not convert it into a railroad use.

Every new or enlarged business within a municipality served by a railroad enhances the probability of additional freight business for the railroad.  But if the mere fact the user of railroad property is a customer, or potential customer, and the use tends ***incidentally*** to enhance the expectation of obtaining additional freight business, converts the use for private business into a use in furtherance of the business of the railroad as a common carrier, the railroad could let its right of way to all types of private enterprises to the complete exclusion of the owner of the fee.

*Id.* at 702-04 (emphasis added) (citations omitted).[6]

Consistent with *Grand Trunk* and *Sparrow*, where courts have concluded that the incidental use doctrine applied, including courts cited by Level 3, they have generally found that

---

[6] Level 3's argument that Ninth Circuit precedent differs from *Grand Trunk* and *Sparrow* is a mischaracterization of *H.A. & L.D. Holland Co. v. Northern Pacific Railway Co.*, 214 F. 920 (9th Cir. 1914).  *See* Level 3 Br. at 7-8.  Contrary to Level 3's arguments otherwise, the court in *Holland* employed an analysis similar to the *Grand Trunk* and *Sparrow* analysis, stating that a railroad may use its rights of way for those uses which "arise out of, or are connected with, the maintenance of the right of way and the operation of a continuous line of railroad thereon." *Holland*, 214 F. at 926.  In its determination of whether the right of way could be used for a public street running parallel to the right of way, the court looked at the railroad's motives stating that "[n]o motive other than that of gain could have actuated the railroad company in attempting to utilize a part of its right of way for a street."  *Id.* at 927.  Accordingly, the primary purpose in allowing the street to be built was not to maintain or operate its railroad or "unbroken right of way," but rather for commercial gain.  *Id.* at 926-27.

the use principally served the railroad's freight delivery or other transportation purposes.[7]

Conversely, where they have found the doctrine inapplicable, that connection has been absent or clearly secondary.[8]

 Level 3 cannot credibly argue that its commercial fiber-optic network **primarily** serves a "railroad purpose."   In its agreement with Union Pacific, Level 3 separately commissioned limited fiber-optic capacity for the railroad's internal use:

> Railroad shall have the right to use the communications capacity, communications services, dark fiber, conduit or innerduct provided to it under the terms hereof . . . **only and solely for its . . . internal communications purposes which are incidental to and needed for its Operations** . . .

Second Affidavit of Joseph E. Jones in Support of Defendants' Motion for Summary Judgment

(Docket #135), Ex. C, § 1(g) (emphasis added) ("1998 Agreement").   Level 3's corporate

---

[7] *See, e.g., Weir v. Standard Oil Co.*, 101 So. 290 (Miss. 1924) (bulk oil operation that was transported by railroad) (cited in Level 3 Br. at 6); *Miss. Invs., Inc. v. New Orleans & Northeastern Ry. Co.*, 188 F.2d 245 (5th Cir. 1951) (use of warehouse for receipt and delivery of freight) (cited in Level 3 Br. at 6); *Mitchell v. Ill. Cent. R.R.*, 51 N.E.2d 271 (Ill. 1943) (bulk oil operation and concurrent retail operation) (cited in Level 3 Br. at 6); *Anderson v. Interstate Mfg. Co.*, 132 N.W. 812 (Iowa 1911) (a warehouse used to facilitate shipments) (cited in Level 3 Br. at 6); *Hall v. Bowers*, 222 N.W. 40 (Neb. 1928) (cited in Level 3 Br. at 6); *Louisville & Nashville R.R. Co. v. Maxey*, 77 S.E. 801 (Ga. 1913) (cited in Level 3 Br. at 6).  *See also Mich. Cent. Ry. Co. v. Bullard*, 79 N.W. 635 (Mich. 1899) (facility used to furnish freight to railroad); and *Gurney v. Minneapolis Union Elevator Co.*, 65 N.W. 136 (Minn. 1895) (warehouse and grain elevator used for handling and transporting of grain by railroad).  *See also Ore. Short Line R. Co. v. Ada Cty.*, 18 F.Supp. 842, 846 (S.D. Idaho 1937) (cited in Level 3 Br. at 6-7) (stating that the operation of a railroad includes buildings or "necessary facilities for handling products and freight presented for shipment" and noting that the buildings at issue in the case were "essential" in storing products shipped on the railroad).

[8] *See, e.g., Chicago & N.W. Ry. Co. v. Thompson*, 127 F.2d 1001 (7th Cir. 1942) (retail gas station); *Sturgeon v. Wabash*, 17 S.W.2d 616 (Mo. Ct. App. 1929) (commercial storage of coal); *Bailey v. Sweeney*, 9 A. 543 (N.H. 1887) (railroad cannot cut and dispose of grass); *Nashville, C. & St. L. Ry. Co. v. Karthaus*, 43 So. 791 (Ala. 1907) (excavating sand from the right of way); *N.Y. N.H. & H. Ry. Co. v. Armstrong*, 102 A. 791 (Conn. 1918) (installation of gas pipelines under the right of way); *Muncie Elec. Light Co. v. Joliff*, 109 N.E. 433, 435 (Ind. Ct. App. 1915) (electric company constructing a line over the right of way); *Hamilton v. Annapolis & E.R. R.R. Co.*, 1852 WL 3036 (Md. June 1852) (the operation of a tavern and a liquor store).

representative testified that this "incidental" use by the railroad was distinct from Level 3's commercial use of its network assets. *See* August 21, 2006 Affidavit of Daniel J. Millea in Support of Plaintiffs' Response to Defendants' Motion for Summary Judgment (Docket No. 138) ("2006 Millea Aff"),  Ex. 1 at 160 (Docket No. 139) (filed under seal).  Thus, the agreement between Level 3 and Union Pacific clearly contemplates two uses:  the railroad's "incidental" use of the fiber-optic assets for its own internal purposes, and Level 3's use of the fiber-optic assets as part of its nationwide commercial communications network.  The latter use represents the core asset of Level 3's telecommunications business, which is in no way designed to further a railroad purpose.  For the incidental use doctrine to apply, the commercial use must be incidental to the primary railroad use.  Under the agreement with Union Pacific, however, Level 3's commercial use is the primary purpose of the fiber installation.  Any railroad use is merely incidental to Level 3's primary, non-railroad purpose.  Applying the incidental use doctrine here would turn the doctrine completely upside down.[9]

---

[9] Plaintiffs do not concede that Level 3's fiber-optic cable is "essential to and necessary for" Union Pacific's operations.  *See* Level 3 Br. at 16-17.  However, as a matter of law, even if the limited fiber capacity Level 3 dedicated for Union Pacific's use were "essential to and necessary for" the railroad's operations, that would not render Level 3's nationwide commercial network a proper "incidental use."  *Hodges v. Western Union Telephone Co.*, 45 S.E. 572 (N.C. 1903) is instructive.  There, the court rejected the argument that the installation of telegraph lines for commercial purposes was justified by the benefits conferred upon the railroad.  The court rejected the need for evidence on whether the telegraph was necessary for the railroad's operations, since "the question of whether or not this telegraph line was necessary is an entirely different one."  *Id.* at 576.  Accordingly, even if fiber-optic technology is deemed "essential to and necessary for the current and future operations of the railroad," as Level 3 claims (*see* Level 3 Br. at 16), there is no question that Level 3's commercial fiber-optic cable installation was not "essential or necessary."

###### 2. The Railroads' Rights To Use The Rights Of Way Were Restricted To "Railroad Purposes" In The Grants Themselves.

The inapplicability of the incidental use doctrine to Level 3's telecommunications business is further established by an analysis of what a "railroad purpose" is. The starting point is Congress' land grant legislation.

The phrase "railroad purpose" has aptly been defined as such purpose "as may be necessary for the construction and maintenance by a railroad company of its railroads and stations, depots and other commodations, necessary to accomplish the object for which the corporation is created." *Ill. Cent. R.R. Co. v. Wathen*, 1885 WL 8476, at *3 (Ill. App. Ct. Dec. 1885). This definition applies to the right of way grants, where "[n]othing was granted for private use or disposal, nor beyond what Congress deemed reasonably essential, presently or prospectively for the quasi-public uses indicated." *Great N. Ry. Co. v. Steinke*, 261 U.S. 119, 124 (1923).

Thus, in the 1875 Act, Congress granted the use of rights of way for a very specific purpose: the construction, operation, and maintenance of a railroad. In contrast to the alternate sections of lands that Congress granted to the railroads in fee simple in earlier statutes, Congress described with specificity that which was authorized to be done in the right of way. This included descriptions of structures and appurtenances that Congress was authorizing be built within the right of way. 18 Stat. 482, § 1. If the railroads had unlimited rights with respect to the use of the rights of way, these provisions would have been wholly unnecessary. Rather, it is obvious that Congress contemplated, and intentionally authorized, all of the rights that it perceived as necessary to construct, operate, and maintain a railroad. Had Congress intended that the railroad rights of way be put to "any purpose whatsoever," or that the railroads possess

14

the right to allow third parties to use the rights of way for purely commercial enterprises, it certainly had the ability to say so.   It did not.[10]

>    3.    **The Supreme Court, Federal Courts, And The Interior Department Have Ruled That The Railroads May Only Use The Rights Of Way For Railroad Purposes.**

The United States Supreme Court, lower federal courts, and federal administrative agencies have consistently held that the railroads are limited in their use of the rights of way to "railroad purposes."   The underlying rationale is simple.   Congress did not grant interests or rights that were *not necessary* to achieving the objectives of constructing and operating a railroad.  *See Barden v. N. Pac. R.R. Co.*, 154 U.S. 288, 319 (1894) (in the construction of grants, "nothing will pass to the grantee, by implication or inference, unless essential to the use and enjoyment of the thing granted").

This rule is reflected in *Holland*, 214 F. at 926, a case relied upon by Level 3 (*see* Level 3 Br. at 7-8), where the Court of Appeals confirmed that railroads were limited in their use of the right of way to "railroad purposes," holding that rights of way granted pursuant to the 1864 Act

---

[10] In a tortured interpretation of "railroad purposes" as envisioned under the 1875 Act, Level 3 attempts to argue that because it performs a communication function (conveying electronic messages) that the railroads once performed (carrying mail), the installation of Level 3's fiber-optic cable is not inconsistent with railroad purposes and is a proper incidental use of the rights of way.  *See* Level 3 Br. at 13-16.  Not only does Level 3 misstate the standard for application of the incidental use doctrine (see discussion *infra* at 10), Level 3 also misconstrues the 1875 Act's use of the term "railroad purposes."   As noted above a "railroad purpose" consists of the construction, operation, and maintenance of a railroad.  Thus "railroad purposes" consist of those uses which facilitate the object for which a railroad was created.  While a "railroad purpose" may arguably consist of a fiber-optic cable which only facilitates the railroad's operations and is dedicated solely to the railroad, it is not, as Level 3 argues, a fiber-optic cable which primarily provides communication services for non-railroad third parties for profit and only incidentally provides communication services for the railroad.

"are acquired upon the implied condition that they be used for railroad purposes, and the rights conferred are limited to such use."

In *Union Pacific*, the Supreme Court determined that the railroad's use of the right of way granted by the 1862 Act was, in fact, restricted to "railroad purposes" by the language of the Act itself.  353 U.S. at 114.  The Court then assessed the railroad's proposed use and concluded that, regardless of the label that might be attached to the railroad's interest in the right of way, the railroad's attempted use of the subsurface for the drilling of oil was "not a railroad purpose" within the authorization granted in the Act.  *Id.*

As the Supreme Court in *Union Pacific* noted, its conclusion and reasoning are overwhelmingly supported by administrative decisions that dealt with similar statutes and which were decided in the decades that followed the enactment of the railroad acts.  *See Id*. at 114 n.1.  Some of the relevant decisions of the Interior Department are:  *Ownership of Minerals Beneath Land Grant Act Right-of-Way Northern Pacific Railroad Co.*, 58 Interior Dec. 160, 162 (1942) ("Since the extraction of minerals from the railroad's right-of-way is not essential to its use for railway purposes, such minerals never passed to the [railroad]");  *Santa Fe Pacific Railroad Co.*, 27 Pub. Lands Dec. 649, 650-51 (1898) (where the enlargement of a pipe line was not for railroad purposes, it was beyond the rights granted to the railroad under a land grant act); *Use of Railroad Right of Way for Extracting Oil*, 56 Interior Dec. 206, 211 (1937) ("any use of a railroad right of way [granted by the 1875 Act], or any portion thereof, for other than railroad purposes is prohibited.  A right of way granted by Congress through the public domain may be used only and exclusively for railroad purposes").

The *Northern Pacific* decision by the Interior Department is particularly instructive here.  After finding that a railroad did not have the right to dredge for gold within the right of way

because it had "only the right to use the land exclusively for railroad purposes," the Interior Department specifically concluded that it was immaterial that the railroad might incidentally benefit from the dredging and that the proposed use did not interfere with the railroad operation. 58 Interior Dec. at 162-63.

### 4. Commercial Telephone, Telegraph And Fiber-Optic Lines Exceed The Scope Of Railroad Easements.

Courts in eleven states have expressly rejected the argument that companies can install telephone or electric lines within a railroad easement without compensating underlying fee owners, contrary to Level 3's view of the breadth of the incidental use doctrine. In the first reported decision addressing the issue, *AT&T v. Pearce*, 18 A. 910, 912 (Md. 1889), abutting landowners sought to enjoin AT&T from installing a telegraph or telephone line along and above a railroad right of way. AT&T contended that the use of the right of way was justified because telegraph lines would also be used by the railroad. *Id*. In a well-reasoned analysis that is squarely on point, the court stated:

> We entertain no doubt whatever as to the right of a railroad company to construct on and over its right of way a telegraph or telephone line, for its use in the operation of its road and dispatch of its business; and it may do this by itself, or may employ another company to do it, or may do it conjointly with another company.

> . . . [O]n the other hand, if this is not the motive for its construction, and the main object in constructing it is to establish an extensive line of telegraph and telephone communication through this and other states, for general commercial purposes, for the use and benefit of [AT&T], and such a line is not reasonably necessary for the purposes of the railroad, then it will be a new easement, and put a new and additional burden upon the land, for which the owners are entitled to compensation.

*Id.* at 913. The court recognized that, since the primary purpose of the cables was to serve AT&T's commercial interests, the fact that the railroad may receive some incidental benefit was

17

not sufficient to justify the use.  *Id.* at 915-16.  Other jurisdictions have confirmed these common

sense conclusions time and again.[11]

More recently, these basic common law principles have been applied with the same force

and effect as the point of conflict has shifted from aerial telegraph and telephone lines to buried

---

[11] *W. Union Tel. Co. v. Nashville, C. & St. L. Ry Co.*, 237 S.W. 64, 65 (Tenn. 1921) ("It is almost everywhere held that the erection of a line of telegraph over the right of way of a railroad company, not to be used in the operation of the railroad, but for purely commercial purposes, imposes an additional burden on the fee, and the owner is entitled to additional compensation from the telegraph company"); *Hodges v. W. Union Tel. Co*, 45 S.E. 572, 576 (N.C. 1903) (rejecting the argument that the installation of telegraph lines for commercial purposes was justified by the benefits conferred upon the railroad); *Phillips v. Postal Tel. Cable Co.*, 41 S.E. 1022 (N.C. 1902), *rev'd on other grounds*, 42 S.E. 587 (N.C. 1902); *St. Louis, I.M.&S. Ry. Co. v. Cape Girardeau Bell Tel. Co.*, 114 S.W. 586, 588 (Mo. Ct. App. 1908) (telegraph company's occupation of the right of way for the purpose of serving the general public as a commercial enterprise constitutes a use of the right-of-way easement other than for railroad purposes); *Pittock v. Cent. Dist. & Printing Tel. Co.*, 1906 WL 3819, at *3-4 (Pa. Super. Ct. May 10, 1906) (rejecting the argument that the installation of telephone lines would be permitted if the telephone company allowed the railroad joint use of the telephone system); *Canadian Pac. Ry. Co. v. Moosehead Tel. Co.*, 76 A. 885, 887 (Me. 1910) (placement of a telephone line upon a railroad right of way constitutes a "taking" that requires compensation to the fee owner); *Muncie Elec. Light Co. v. Joliff*, 109 N.E. 433, 435-36 (Ind. Ct. App. 1915) (railroad lacks authority to grant an electric company permission to construct a line over right-of-way easement); *Citizens' Tel. Co. v. Cincinnati, N.O. & T.P. R. Co.*, 233 S.W. 901 (Ky. 1921) (as opposed to the owner of the fee, a railroad cannot prevent a telephone company from maintaining lines across a railroad right of way because the railroad's interest is only an easement); *Agostini v. N. Adams Gaslight Co.*, 163 N.E. 745, 746-47 (Mass 1928) (power company must remove its tower and electric wires from plaintiff landowner's property because contract with the railroad did not provide sufficient authorization); *Dickman v. Madison County Light & Power Co.*, 136 N.E. 790, 795 (Ill. 1922) (if power lines installed within railroad right of way were for commercial purposes, "they are not within the scope of the original easement, [and] they are illegal and an additional burden on the fee"); *Chambers v. Great N. Power Co.*, 110 N.W. 1128, 1130 (Minn. 1907) (a railroad "never had the authority under its charter to acquire the right of way for the purpose of leasing the right to [a telephone company] to maintain the same independent of the operation of a railway").  Level 3's attempt to distinguish *Hodges*, *St. Louis R.R.*, *Am. Tel. & Tel.*, and *Pittock* (*see* Level 3 Br. at 12) by stating that under Idaho law (unlike the applicable state law in these cases) Level 3's fiber-optic cable is not an additional burden on the Plaintiffs' property fails.  *See* discussion *infra* at Section I.C.  Additionally, Level 3's claim that in these cases the telegraph lines were used solely for commercial uses is a mischaracterization of these cases.  *See* Level 3 Br. at 12.  Quite the contrary, and identical to the telecommunications use at hand, the courts specifically recognized that the telegraph did not primarily benefit the railroad, but rather primarily served a commercial purpose.

fiber-optic cable.  The Tennessee Supreme Court ruled in 1992 that Southern Railroad could not grant Sprint the "right" to lay fiber-optic cable along its right of way without the consent of the underlying landowners because "the installation of the telephone cable without the consent of the owners of the fee constituted the taking of an interest in the property for which they are entitled to compensation."  *Buhl v. U.S. Sprint Commc'ns Co.*, 840 S.W.2d 904, 912 (Tenn. 1992).  The court rejected Sprint's argument that "the easement for railroad purposes includes the right to allow third parties to use portions of its right of way provided such use is not inconsistent with and does not interfere with the railroad's use of the property," holding instead that the third parties' use "must also be 'needful and helpful to the operation of the road itself.'"  *Id.* at 911 (citation omitted).  Like Sprint's, Level 3's telecommunications network does not serve a purpose of the railroad itself, and is not an incidental use of the railroad right of way.

Inexplicably, Level 3 seeks support from *Home on the Range v. AT&T Corp.*, 386 F. Supp. 2d 999, 1021-22 & 1024 (S.D. Ind. 2005), arguing that the court recognized the incidental use doctrine.  *See* Level 3 Br. at 11.  But the *Home on the Range* court specifically rejected the same argument Level 3 makes here; that commercial fiber-optic networks further a railroad purpose and are therefore within the scope of the railroad easements.  *Id.* at 1021.  The court stated that, even if it assumed that Congress expected the railroads to use "communications technology for the purpose of facilitating the operation of the railroad itself," and even if it further assumed that AT&T's cables "did further a purpose of the railroad, the question would remain whether leasing the rights to a third party, as the railroad here did, is within the scope of its granted rights."  *Id.*

The court then went on to reject AT&T's argument that "the railroads 'may use their federally granted right of way for *any purpose not inconsistent with* railroad operations.'"  *Id*.

(quoting AT&T's brief) (emphasis in opinion).   That is the same "incidental use" argument

Level 3 makes here, and the *Home on the Range* court properly rejected it:

> The clear implication of *Union Pacific* is that purposes that are not incidental to or
> do not facilitate the operation of the railroad are beyond the scope of the pre-1871
> grants. . . . And *Great Northern* states explicitly that the 1875 Act grants to the
> railroads rights qualitatively and quantitatively lesser than those granted under the
> earlier acts.   Accordingly, the court rejects AT&T's proposed interpretation of the
> 1875 Act.   The installation and operation of fiber optic communications cables
> does not derive from or further a *railroad* purpose, even though it may well serve
> a broader public purpose.   The court therefore cannot hold as a matter of law that
> installation of AT&T's cables within the rights of way . . . was within the scope of
> the railroad easements.

*Id.* at 1024 (citation omitted) (emphasis in original).[12]

###          5.          The Various Cases Cited By Level 3 For The Proposition That Commercial Fiber-Optic Cable Constitutes An "Incidental Use" Are Inapposite.

Level 3 argues that there are four contrary decisions interpreting the incidental use

doctrine as allowing the installation of fiber-optic cable on railroad right of way easements:

*Klump v. MCI Telecomms. Corp.*, No. 4:01-CIV 01-421 ACM, 2003 WL 24296629 (D. Ariz.

Mar. 25, 2003); *Hynek v. MCI World Commc'ns, Inc.*, 202 F. Supp. 2d 831 (N.D. Ind. 2002);

*Int'l Paper Co. v. MCI Telecomms., Corp.*, 202 F. Supp. 2d 895 (W.D. Ark. 2002); and *Mellon v.*

*S. Pac. Transp. Co.*, 750 F. Supp. 226 (W.D. Tex. 1990).   However, the reasoning employed by

the courts in those cases was fundamentally flawed, and the decisions are in conflict with clear

constitutional and common law principles.

---

[12] Level 3 attempts to distinguish the *Home on the Range* decision on the ground that the court
noted that AT&T did not establish that its cables furthered a purpose of the railroad.   However,
the *Home on the Range* court explicitly stated that ***even if*** the cables did further a railroad
purpose, as Level 3 alleges is the case in Idaho, the court would still face the question of whether
such a network is within the scope of the 1875 Act easements.   Because the primary purpose of
the Level 3 network is its own commercial use, the installation is clearly outside the scope of the
easements.

*Klump* is an unreported, six-page opinion concerning the installation of MCI's fiber-optic cable in 1875 Act rights of way that was incorrectly decided.  It is, essentially, the feeble counterweight to the extensive decision in *Home on the Range* concerning precisely the same issues.  It is useful to compare the reasoning employed by the court in *Klump* and the detailed and thorough analysis by the court in *Home on the Range* – the two decisions most closely on point with the instant dispute.  The federal judge in *Home on the Range* explored and understood the complex issues in depth, and he authored a cogent opinion explaining the rationale for his conclusions.  Conversely, the cursory opinion in *Klump* demonstrates a far more limited understanding of the broad issues, leading to an opinion of equally limited value.[13]

*Hynek* was wrongly decided, and stands in direct conflict with long-standing Indiana law, because of its misplaced reliance on *Ritz v. Indiana & Ohio Railroad, Inc.*, 632 N.E.2d 769 (Ind. Ct. App. 1994), which was a *highway* easement case, not a case involving a *railroad* easement. In *Ritz*, telephone lines were installed within a *highway* easement that happened to cross a railroad right of way, and the court held that the fee owner was not entitled to compensation, because he had been compensated for all public uses (including telephone service) when the *highway* easement was created.

The *Mellon* decision blatantly misapplies the incidental use doctrine.  Citing *Grand Trunk*, the *Mellon* court concluded that the installation of fiber-optic cable is an authorized incidental use because it is "not inconsistent with railroad uses."  750 F. Supp. at 231.  However, as discussed above, in addition to an "inconsistency" analysis, *Grand Trunk* and *Sparrow* require that the use be primarily for the benefit of the railroad.  When Sprint advanced the same

---

[13] Notably, Judge David F. Hamilton, who authored the *Home on the Range* decision, was recently appointed to the Seventh Circuit Court of Appeals.

argument before the Tennessee Supreme Court, it was rejected outright. *Buhl,* 840 S.W.2d at 911.

In *International Paper*, the court began its analysis with a fatal misunderstanding of how the phrase "railroad purposes" has been used historically in the case law. 202 F. Supp. at 900. The phrase has two *very* distinct meanings, which reflect the development of two distinct bodies of law. The court in *International Paper* erroneously used the legal analysis applicable to the first of those bodies; the case should have been controlled by the second body of law, which mandates an entirely different legal analysis.

In the first body of law, the railroad holds a ***fee interest*** in the land and the issue is whether a particular use of the land constitutes a *complete abandonment* of the land, typically because the railroad's interest is a conditional fee that requires the continued use of the land for railroad purposes only (or pursuant to the corporate *ultra vires* doctrine). In contrast, in the second body of law, the railroad holds only an ***easement*** in the land and the issue is whether a particular use is within the scope of the easement.

The "condition" in a "conditional fee" has been defined as a "qualification or restriction annexed to a conveyance of lands, whereby it is provided that in case . . . the grantee does or omits to do a particular act, an estate shall . . . be defeated." *Black's Law Dictionary* (6th ed. 1993). Thus, in this sense, the phrase "railroad purposes" is unrelated to any "affirmative" right of use possessed by the railroad, but rather is a *minimum requirement* that must be met in order for the railroad to continue holding its interest in the land. A cause of action arises *only if* a railroad ceases to use a parcel of land for railroad purposes. A failure to use the land for "railroad purposes" *altogether* constitutes the "trigger" for the reversion of the railroad's fee interest to the grantor.

In the second body of law, where the railroad holds only an *easement*, the phrase "railroad purposes" defines the "affirmative rights" that have been granted to the railroad by the underlying fee holder and, thus, the uses to which the railroad may put the land without risk of liability.  A cause of action arises when a railroad's use exceeds the scope of the specific rights it was granted when it acquired the easement.  If the court finds that a use exceeds those rights, the railroad's interest in the land remains unaffected, but the railroad incurs liability for misuse.

The distinction between the ***power*** and the ***rights*** of a railroad was aptly described in *Missouri-Kansas-Texas R.R. Co. v. Freer*, 321 S.W.2d 731, 737 (Mo. Ct. App. 1958):

> In so far as the power of the railroad is concerned in the use of its property, it is limited only by its charter franchise, and the general statement is that it has power to permit the use of its property for any purpose which is not inconsistent and does not interfere with its use for railroad purposes.  As to the right of the railroad, it is generally said that (subject to restraints which may be imposed by grant or withheld by quantity of title taken in eminent domain) it may use the right of way for all incidental purposes which are 'reasonably necessary or convenient' in order to facilitate the operation of its business.

Many of the cases relied upon by the *International Paper* court represent a hybrid strain of the two bodies of law.  In these cases the plaintiffs sought a "*conditional fee*" remedy (*retaking absolute possession*) for land in which the railroad potentially only possessed an *easement*.[14]  Because the remedy was a demand for forfeiture and an immediate threat to the continued operations of the railroad (regardless of whether it held an easement or a conditional fee interest), the courts correctly held that, in order to prevail, the plaintiff would have to demonstrate that the alleged "misuse" of the land was evidence of complete *abandonment* in that

---

[14] *See e.g. Coleman v. Mo. Pac. R.R. Co.*, 745 S.W.2d 622 (Ark. 1988) (quiet title action, claiming title reverted since easements no longer used for railroad purposes); *Boyd v. Pierce*, 644 S.W.2d 927 (1983) (suit to establish absolute title to easement or conditional fee on the theory that the railway company had abandoned estate); *Ritter v. Thompson,* 144 S.W. 910, 911 (Ark. 1912) (contention that fee owner had the right to re-enter and take possession of an unused easement); *see also St. Louis-San Francisco Ry. Co. v. White*, 132 S.W.2d 807 (Ark. 1939) (nature of reverter rights arising from the discontinuance of use for railway purposes).

the railroad was no longer pursuing any railroad purpose.  That is not the proper standard when the question is whether – in addition to the continuance of railroad operations – a new use is merely incidental or constitutes an improper, separate commercial use.

In short, the analysis contained in the hybrid cases was entirely inapplicable to the *International Paper* case, just as it is here.

C.    **Level 3's Contention That Idaho Law Allows The Installation Of Its Fiber-Optic Cable Irrespective Of Plaintiffs' Land Rights Is Contrary To The Idaho And U.S. Constitutional Protections Against Government Takings Without Just Compensation.**

Level 3 argues that the Idaho statutes and Idaho Constitution authorize it to install and operate fiber-optic cable on land owned by Plaintiffs, without compensating them for Level 3's commercial use of their property.  *See* Level 3 Br. at 8 & 12.  Level 3 further argues that summary judgment should be granted as to Plaintiffs' claims for declaratory and injunctive relief because Level 3 is therefore authorized to install its cable in railroad rights of way in Idaho.  *See* Level 3 Br. at 29.  These arguments fail because even if Level 3 has been granted the power of eminent domain to install its cable, the Idaho and United States Constitutions contain provisions requiring "just compensation" for all property interests taken by eminent domain.  *See* Idaho Const., art. I, § 14 ("[p]rivate property may be taken for public use, but not until a just compensation, to be ascertained in the manner prescribed by law, shall be paid therefor"); U.S. Const., amend. V ("nor shall private property be taken for public use, without just compensation").  Indeed, the Supreme Court, and the highest courts of at least five states with statutes similar to that cited by Level 3, have concluded that constitutional provisions ensuring "just compensation" require payment to the owners of fee interests underlying railroad rights of way before the rights of way may be further burdened.  *Chicago, B. & Q. R. Co. v. City of Chicago,* 166 U.S. 226, 257-58 (1897); *Phillips*, 41 S.E. at 1027; *Buhl*, 840 S.W.2d at 912-13;

*Canadian Pac.*, 76 A. at 887; *AT&T*, 18 A. at 914; *SW. R. Co. v. S. & Atl. Tel. Co.*, 1872 WL 2649, *6 (Ga. July 1872).

Further, the case cited by Level 3 in support of its contention is inapplicable, because it involved a highway right of way secured by the state of Idaho from the federal government, not a railroad right of way granted to a private company. *Mountain States Tel. & Tel. Co. v. Kelly*, 459 P.2d 349 (Idaho 1969). The scope and purposes of these two types of easements are very different. Easements for public highways "are so taken or granted for all the purposes for which they may be used for the benefit of the public." *People v. Eaton*, 59 N.W. 145, 146 (Mich. 1894). In contrast, as the Ninth Circuit has recognized, federal land grants to railroads are "not for public purposes generally, but for a single designated public purpose," the operation of a railroad. *Holland*, 214 F. at 926. Because of the substantial differences between the rights of the underlying fee owners, the highway case cited by Level 3 is simply irrelevant.

### D.    Level 3's Argument That Any Right-Of-Way Interest Not Granted To The Railroads Now Resides In The United States Government Is Patently Wrong.

Level 3's argument that the United States owns the underlying fee in the property at issue here has been repeatedly rejected by federal courts. It is clear from the reported decisions that the patentees along 1875 Act routes hold the underlying fee interests, and the most the government can claim is a reversionary interest in the railroad surface easements. In addition, the United States government has explicitly abandoned any claim to the fee interest and admitted that the most it has is a reversionary interest in the railroads' surface easement rights.

1.     **The Well-Reasoned *Hash*, *Beres*, *Brown* and *Home on the Range* Decisions Expose Level 3's Erroneous Interpretation Of Prior Statutes And Case Law.**[15]

Level 3's contention, that the United States retained the reversionary interest in the land underlying the railroad right of way created by the 1875 Act, was flatly rejected by four federal courts that recently analyzed this issue in detail.  The plaintiffs in *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005) – represented by the same counsel that represent the Plaintiffs in this case – alleged that under the 1875 Act, the railroads obtained only easement interests across their property, which interests were later abandoned.  The plaintiffs brought suit against the United States and sought compensation for the unlawful taking of that property when the land was converted to trail use without their authorization.  *Id.* at 1311-12.  The case was certified as a class action in this Court, which later found that the government held the reversionary interests in the right of way.  The Court of Appeals for the Federal Circuit reversed, ruling that the servient estates to 1875 Act easements were included in land patents issued to homestead settlers.  *Id.* at 1318.[16]

The *Hash* court first analyzed what rights had been patented out to the adjoining landowners and what rights were explicitly retained by the government:

---

[15] Level 3 attempts to dismiss *Hash*, *Beres*, *Brown*, and *Home on the Range* with the argument that they are not controlling in this circuit.  Level 3 Br. at 19-20.  Of course Ninth Circuit law controls in this Court.  Nonetheless, the extensive analyses in *Hash*, *Beres*, *Brown*, and *Home on the Range* represent the most thorough treatment of the issues now before this Court, and demonstrate that Level 3's legal arguments cannot withstand a thorough review.  Moreover, Level 3's argument that the Ninth Circuit case law mandates a different analysis than was applied in *Hash*, *Beres*, *Brown*, and *Home on the Range* is simply wrong.  The cases Level 3 cites in support of that claim – *Vieux*, 906 F.2d 1330 and *Oregon Short Line*, 617 F. Supp. 207 – are entirely consistent with Plaintiffs' position here.  *See* Section I.D.3, *infra*.

[16] The United States Court of Appeals for the Federal Circuit has exclusive jurisdiction over all appeals brought in takings cases against the United States.  28 U.S.C. § 1295.

> The [plaintiffs] stress the well-recognized rule that property rights that are not explicitly reserved by the grantor cannot be inferred to have been retained.  The land patents granted pursuant to the Homestead Act reserved to the United States certain specified rights, *viz.* previously vested and accrued water rights, previously granted mineral rights, and rights-of-way for ditches or canals.  None of these patents mentions retaining or reserving to the United States any title or other ownership interest or reversion right in the land underlying previously granted railroad rights-of-way.

403 F.3d at 1314 (citation omitted).  The court also noted that an Interior Department regulation in existence until 1976 made it clear that under the 1875 Act the railroads held only easements and the underlying fee-simple title "is granted to the person to whom the patent issues for the legal subdivision on which the right of way is located, and such patentee takes the fee subject only to the railroad company's right to use and possession."  *Id*. at 1314-15 (quoting 43 C.F.R. § 2842(a)).

The court went on to discuss the impact of various subsequent statutes (including 43 U.S.C. § 912 which is discussed in detail in Section I.D.2.), which the government argued supported a finding that the United States retained any underlying fee interest or reversionary rights.  The court implicitly stressed the importance of determining who held the rights in question at each key point in time.  Since the Homestead patents transferred any reversionary interest to the patentees before the subsequent statutes were enacted, the court found that those statutes could not alter the nature of those rights.  *Id*. at 1315.  This did not mean the subsequent statutes were of no moment, but under the circumstances all they could do is serve as a "quiet title act" in the event any rights did remain in the government:

> [T]he Railroad Rights-of-Way Abandonment Act of 1922, codified at 43 U.S.C. § 912, . . . was of the nature of a "quiet title" enactment, for it provided that when a railroad ceased use and occupancy of a right-of-way that was originally granted from the public lands, the disposition of that relinquished right-of-way depended on whether the title had previously been granted to a private owner.

*       *       *

27

> The statute requires the United States to convey any rights it may have, to the patentee of the land traversed by the abandoned right-of-way; it does not say what rights the United States had after the land patent was granted. . . . Neither section 912 nor 913 purported to establish governmental ownership of land that had been granted to homesteaders subject to a right of way easement.

*Id.* at 1317-18.

The *Hash* court noted that the key fact was the absence of any evidence that the federal government retained an interest in the rights of way when it patented out the adjoining land to homesteaders: "The record shows no documents retaining a fee interest by the United States when granting any of the land patents here involved." *Id.* at 1318. The same is true here. Level 3 has identified no documents in which the United States retained a fee interest in the right of way property when it patented out the Idaho class members' lands to their predecessors in title. Indeed, the Plaintiffs' patents demonstrate that the United States did not retain a fee interest in the land underlying the railroad rights of way at issue in this case. Not a single patent mentions that the United States retained or reserved a right in the land underlying the previously granted railroad right of way. *See* Affidavit of Dan Millea in Support of Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Millea Aff.") at Exhibits 1, 2 and 3.[17]

In the decisions upon which Level 3 relies, the courts repeatedly failed to recognize the importance of focusing on the language of the 1875 Act and the language of the subsequent patents. In its carefully-reasoned opinion in *Beres v. United States*, 64 Fed. Cl. 403. 425 (Fed. Ct. 2005), a case on all fours with *Hash*, the United States Court of Federal Claims noted the significance of this fundamental error:

---

[17] Like the patents in *Hash*, the Plaintiffs' patents reserve only water rights, mineral rights, and rights of way for ditches or canals. *See id.* at Exhibits 1, 2 and 3. *See Hash*, 403 F.3d at 1314.

Of significance is that none of the cases which have found a reversionary interest in the United States analyzed the words of the 1875 Act, or an intervening land patent from the United States, to determine the nature of the land interest before and after a railroad right-of-way grant.  Instead, the cases have relied only on language or legislative history of later congressional enactments and other court opinions to explain and interpret the words and effect of the 1875 Act.  Moreover, all of these explanations included in statutes and cases which acknowledge a reversionary interest in the United States occurred after the United States had issued a land patent to [the homestead settler] in 1892.  If these subsequent statutory directions or court interpretations were to be followed, they would retroactively impact the property rights [the settler] thought he had obtained, based on a reasonable, contemporaneous understanding of the 1875 Act and the land patent issued to him.

The fundamental principle that was clear to the *Hash* and *Beres* courts has been consistently expressed by the United States Supreme Court:  **unless expressly reserved** by the United States, **all title passes in land patents to the patentee.**  *Leo Sheep Co. v. United States*, 440 U.S. 668, 678-81, 687 (1979); *Boesche v. Udall,* 373 U.S. 472, 477 (1963); *Swendig v. Wash. Water Power Co.*, 265 U.S. 322, 331 (1924); *Burke v. S. P.R. Co.*, 234 U.S. 669, 698 (1914); *Hastings & Dakota R.R. Co. v. Whitney*, 132 U.S. 357, 360-61 (1889); *United States v. Schurz*, 102 U.S. 378, 402 (1880); *cf. Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865, 877 (1999); *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 49 n. 9 (1983).

Following the reasoning in *Beres and Hash*, the court in *Brown v. Northern Hills Regional Railroad Authority*, 732 N.W.2d 732, 740 (S.D. 2007) also held that any interests the United States retained in railroad rights of way issued under the 1875 Act were extinguished when land patents were issued that failed to expressly reserve any right in the railroad rights of way.  The court noted that its decision conformed to the analysis under *Beres* and *Hash*, in addition to Supreme Court decisions on the issue.  *Id.* at 739.  Significantly, the court overruled prior precedent, stating:

Today, taking into consideration the language of the patent, we revisit our rationale in *Barney* [*v. Burlington N. R.R. Co.*, 490 N.W.2d 726 (S.D. 1992)] and our determination that the United States retained a reversionary interest in an

> 1875 Act [right of way].  . . . We find *Beres* and *Hash* to be the more persuasive
> authorities.  These federal cases recognize the significant role a land patent plays
> in establishing title to property.  A patent to land, issued by the United States
> under authority of law, is the highest evidence of title, something upon which the
> holder can rely for peace and security in his possession.  The United States
> Supreme Court has stated that when a patent issues in accordance with governing
> statutes, all title and control of the land passes from the United States.  Our
> holding today recognizes the special need for certainty and predictability where
> land titles are concerned.

*Id*. at 739 (quotations and citations omitted).

Also following *Beres* and *Hash*, the federal court for the Southern District of Indiana issued its 2005 decision in *Home on the Range* that is directly on point here.  The *Home on the Range* court presides over a certified nationwide class action against AT&T, brought by landowners with claims that are materially identical to the claims at issue in the instant case. AT&T brought a motion for summary judgment against certain plaintiffs who own property along land grant routes created by the 1862, 1864 and 1875 Acts, making many of the same arguments as Level 3 concerning the 1875 Act.  The court essentially agreed with AT&T concerning property interests granted by the 1862 and 1864 Acts.  On the 1875 Act routes, however, the court rejected all of the arguments Level 3 makes here, holding that: (1) the patentees received fee title to the land; (2) the government has no reversionary interest in the underlying servient estate; and (3) AT&T's commercial fiber-optic network is beyond the scope of the 1875 Act railroad easements.

The *Home on the Range* court found that the "lands over which the rights of way passed could be disposed of by patents," because the 1875 Act conveyed only easements to the railroads and therefore did not remove the land itself from the public domain:  "The land within the boundaries of the right of way had not been appropriated and removed from the public domain, so those predecessors received property rights in the servient estates."  386 F. Supp. 2d at 1018.

The court explicitly rejected the same argument Level 3 makes here, that a different result is required under *Vieux*, 906 F.2d 1330, *Oregon Short Line*, 617 F. Supp. 207, and a handful of other decisions dealing with the issue of reversionary rights held by the government:

> In holding that the United States had retained such a reversionary interest, the *Oregon Short Line* court was addressing *only the use of the right of way itself*, without addressing ownership of the servient estate. . . . The court did not address and did not need to address the significance of Section 4 of the 1875 Act and its provision that lands could be disposed of subject to the right of way, which clearly implied that the appropriation doctrine would not apply to the servient estate.

*Home on the Range*, 386 F. Supp. 2d at 1019 (emphasis added).  The court went on to reject as unpersuasive the reasoning of two of the other cases on which Level 3 relies here – *Whipps Land Cattle Co. v. Level 3 Commc'ns, LLC*, 658 N.W.2d 258 (Neb. 2003) and *Klump*, 2003 WL 24296629* – and to note that the other decisions relied on by AT&T (and Level 3 here), including *Vieux*, simply did not deal with the question of the government's interest in the servient estate. *Home on the Range*, 386 F. Supp. 2d at 1019-20 and n. 9.

> **2.      The Twentieth Century Statute Relied On By Level 3 Is Curative In Nature, And Is Not Indicative Of Congress' Original Intent In The Railroad Land-Grant Statutes.**

Even if one were to ignore *Hash*, *Beres*, *Brown*, and *Home on the Range*, Level 3's argument that this Court should determine Congressional intent in the 1800s and early 1900s by reference to a subsequent statute is unsupportable.  *See* Level 3 Br. at 18-19.  As a preliminary matter, "[t]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."  *Waterman S.S. Corp. v. United States*, 381 U.S. 252, 269 (1965) (citation omitted).  Moreover, the statute was merely curative.

The statute in question, the Act of March 8, 1922, 42 Stat. 414, 43 U.S.C. § 912, was a part of Congress' attempt to solve the problem of the ownership of right of way land, either where the railroad ceased using the line, or where the right of way was forfeited because the

railroad was never built.  Congressional action was deemed to be essential because the "limited fee" concept, articulated by the Supreme Court in *Townsend* and *Stringham,* had created a great deal of confusion.  If the "limited fee" references were seen as something more than mere *obiter dictum*, the cases would contradict the instruments of title by which thousands of settlers had obtained title to their land.  Congress acted to cure the uncertainty created by *Townsend* and *Stringham*, and viewed in this context the intent behind the 20th Century statute is perfectly clear.

The 1922 statute provided that, upon abandonment or forfeiture, ownership of the right of way land would vest in those persons "to whom or to which title of the United States may have been or may be granted, conveying or purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied by such railroad . . ."  Under this statute, Congress was attempting to end any title problems by confirming that full ownership would be vested in those persons who had already received patents for the land traversed by the right of way, *i.e.*, the underlying property owners.

Thus, the 1922 Act was not a new grant by Congress to the patentees of a previously retained underlying fee interest in land as Level 3 suggests.  Instead, Congress acted to confirm that common-law principles would apply, and that the land underlying the right of way would continue to be held by the persons who already owned it: the abutting landowners.  Additionally, as the government has since conceded, the most it can claim is a reversionary interest in the **railroad easement itself**, **not the underlying fee interest** that was clearly transferred to patentees (*see* discussion in Section I.D.4., *infra*).

3.    **The Cases Cited By Level 3 Do Not Support The Conclusion That The United States Retained A Fee Or Reversionary Interest In The Servient Estate Underlying The Railroad Rights Of Way.**

The cases relied upon by Level 3 stand for nothing more than the proposition that, under later 20th Century federal statutes, a railroad's surface easement rights may revert to the United States upon abandonment.

In *Marshall v. Chicago & Nw. Transp. Co.*, 31 F.3d 1028, 1031 (10th Cir. 1994), the court noted that the Act of 1922 was enacted in a historical setting before the Supreme Court had rejected the conclusion of *Stringham* that a right of way granted by the 1875 Act was a "limited fee."  Recognizing *Great Northern*, the Tenth Circuit interpreted the 1922 Act by concluding that, although Congress could not define the precise nature of the government's retained property interest, the 1922 Act was enacted to specifically dispose of the United States' retained interest in the 1875 Act rights of way, whatever it might be.  *Id.*  The court expressly adopted the results and rationale of *Oregon Short Line*, 617 F. Supp. at 207,[18] and quoted extensively from that decision:

> In enacting these statutes [Abandonment Act of 1922], Congress clearly felt that it had some retained interest in railroad rights-of-way.  The precise nature of that retained interest need not be shoe-horned into any specific category cognizable under the rules of real property law.  Based on *Townsend, Stringham* and other decisions, congressional committeemen in the early 1920's spoke of this retained interest in terms of an "implied condition of reverter."  Regardless of the precise nature of the interest, Congress clearly believed that it had authority over 1875 Act railroad rights-of-way.

31 F.3d at 1032.

---

[18] *Oregon Short Line* is another case relied upon by Level 3.  *See* Level 3 Br. at 18-19.  There, the court simply held that the surface easement reverted to the United States.  617 F. Supp. at 212.  As noted above, it did not address the ownership interest of the servient estate.  *See* discussion at 8-9.

The conclusion in *Vieux*, 906 F.2d at 1330 was the same:  Congressional statutes simply sought to retain a reversionary interest in the surface easements.  *Id.* at 1342-43.

Level 3 also relies upon *United States v. Marvin M. Brandt Revocable Trust*, No. 06-CV-184-J, 2008 WL 7185272 at *6-7 (D. Wyo. Apr. 8, 2008) which relies upon *Marshall's* conclusion that the United States had a reversionary interest in the railroad rights of way and recognizes the similar conclusion reached in *Vieux*.  Following suit, the court held that the United States retained a reversionary interest in the 1875 Act rights of way, which were the surface easements the railroad had abandoned and which were at issue in the case.  *Id.* at *7.

Thus, the results in *Marshall, Oregon Short Line*, *Vieux*, *Brandt* and the other cases cited by Level 3 are not inconsistent with the position advocated by Plaintiffs here:  that the abutting property owners own the fee to the right of way land, subject to the railroad's right to use the right of way easement for railroad purposes.  At most, these cases support the argument that, upon abandonment, the surface *easement* interests revert to the United States – but that is of no value to Level 3.

### 4.     Even The United States Government Has Abandoned Any Claim To A Reversionary Interest In The Fee Underlying 1875 Act Rights Of Way.

After the Court of Appeals issued its landmark decision in *Hash*, the United States filed a Petition for Panel Rehearing.  See 2006 Millea Aff., Ex. 2 (Docket No. 140).  In its Petition, the United States explicitly disclaimed any reversionary interest in the ***land underlying*** 1875 Act railroad rights of way:

> Neither the 1875 Act, nor the homestead laws, nor the sample patents relied on by the panel would appear to support an argument that the United States retained a strip of land in fee under the railroad's right-of-way easement.

* * *

The homestead patentee, however, owns the fee interest in the land underlying the right-of-way, whether the right-of-way is in the possession of the railroad or has reverted to the United States.  This view of the 1875 Act rights-of-way is most consistent with the case law and subsequent acts of Congress addressing reversionary interests in the 1875 Act rights-of-way.

* * *

It is the United States' view that it retained, as it did for <u>all</u> federally granted railroad rights-of-way, an implied condition of reverter in the rights-of-way, so that if the railroad forfeited or abandoned the right-of-way, the railroad's interest in the right-of-way reverted to the United States.

*Id*. at 2-4 (emphasis in original).  With the filing of this Petition by the government in *Hash*,

Level 3's position that the fee interest at issue in this case is held by the United States has not

only been repeatedly rejected by courts around the country, but it has also been abandoned by the

government itself.[19]

## II.    The Court Should Deny Level 3's Requested Summary Judgment With Respect To All Class Members Who Did Not Own Their Property When The Cable Was Installed Because The Trespass At Issue Is A Continuing Trespass And Level 3's Unjust Enrichment Is Ongoing.

Level 3 asks the Court to find that the trespass at issue in this case is a permanent

trespass, and, therefore, enter summary judgment in its favor as to all Class Members who did

not own their adjoining property at the time the fiber-optic cable was installed.  Level 3 Br. at

23-29.  The motion should be denied because the trespass at issue is the use of the cable for non-

railroad purposes, not the mere installation of the cable.   In addition, Level 3's unjust

enrichment, a separate and distinct cause of action, is ongoing.

---

[19] It is Plaintiffs' position that the United States has no reversionary interest in the rights of way *or* the underlying land.  However, even if the United States did have some reversionary interest, the most it could hold would be an interest in the railroads' easements, which would not aid Level 3 in this case.

A.      **Level 3's Use Of The Cable For Commercial Purposes Is A Continuing Trespass.**

Level 3 contends that "fiber optic technology is essential to and necessary for the current and future operations of the railroad."  Level 3 Br. at 16.  While it is an open question whether such technology is "essential and necessary," Plaintiffs acknowledge for purposes of Level 3's motion that an easement for railroad purposes may be sufficiently broad to allow for the installation of telecommunications facilities strictly for use by the railroad in the safe and efficient operation of the railroad.  We explain, *supra* at Section I.B., why Level 3 cannot bootstrap a limited installation of a railroad communication system into the wholly separate use of the cable for commercial telecommunications services under the "incidental use" doctrine. However, because a tiny fraction of the transmission capacity of each operational conduit was reserved for railroad purposes, 1998 Agreement at §§ 1(g), 4 and Exhibit C to 1998 Agreement,[20] the installation in 2000 was not in and of itself the improper trespass at issue here. Rather, the trespass in question consists of the use of the installed fiber-optic technology by Level 3 for commercial telecommunications purposes unrelated to railroad operations.  That trespass is continuing, not permanent.

Actions on an easement that exceed the scope of the easement are a trespass. *State ex rel. Evans v. Spokane Int'l R.R. Co.*, 579 P.2d 694, 695-96 (Idaho 1978) (trespass resulted when railroad removed gravel not just for portion of right of way over gravel (permitted), but for entire

---

[20] Union Pacific was entitled to a small portion (one or a fraction of a DS-3 line) of the transmission capacity of every conduit Level 3 filled with dark fiber.  Union Pacific's right to use this transmission capacity was limited to "only and solely for its . . . internal communications purposes which are incidental to and needed for its Operations . . . .  'Operations' shall mean all businesses and operations of Railroad . . .  excluding however any business or operation in competition with Level 3's Fiber System as contemplated herein." 1998 Agreement at § 1(g). Union Pacific could exchange portions of the telecommunications capacity Level 3 gave it, but only with another railroad which would use the capacity for railroad purposes. *Id.*

road); *see also Blalock Eddy Ranch v. MCI Telecomms. Corp.*, 982 F.2d 371, 373-74 (9th Cir. 1992) (in original proceeding, MCI found liable for trespass when it installed telecom cable along water easement even when portion of cable capacity was used by Department of Water Resources which held the easement).  The trespass at issue here is the action that exceeds the railroad easement – namely, the ongoing commercial use by Level 3.

      **1.**      **A Trespass That Results From Unsanctioned And Abatable *Use* Of A Plaintiff's Land Is A Continuing Trespass.**

Idaho recognizes causes of action for both permanent and continuing trespass.  *Compare Boise Valley Constr. Co. v. Kroeger*, 105 P. 1070, 1075 (Idaho 1909) (railroad grade built on owner's land was permanent trespass), *with Rogers v. Ore.-Wash. R.R. & Navigation Co.*, 156 P. 98 (Idaho 1916) (finding continuing trespass where railroad embankment causes flooding).  Both cases involved permanent railroad structures.  In the first case, it was the creation of the structure (necessary to the operation of the railroad) itself that was a trespass.  "The acts of the tort-feasor [were] completed and consummated" when the construction was done.  *Kroeger,* 105 P. at 1075.  The tort was not continuing and abatable.  *Id.*  In *Rogers*, it was the flooding that was the trespass.  The flooding was not necessary to the purpose of the railroad.  *Rogers,* 156 P. at 102.  Nor did it necessarily and directly flow from the creation or maintenance of the permanent structure.  Therefore, "successive actions may be brought, in each of which recovery may be had for all damages actually suffered within the period of limitations, regardless of the date of the erection of the structure, to the maintenance of which the damage is indirectly due."  *Id.*[21]

---

[21] Idaho's recognition of a continuing trespass is not unique.  *See, e.g., United States v. Hess*, 194 F.3d 1164, 1177 (10th Cir. 1999) (gravel extraction a continuing trespass); *Knapp & Cowles Mfg. Co. v. N.Y., New Haven & Hartford R.R. Co*, 56 A. 512, 514 (Conn. 1903) (use of plaintiff's land for railroad purposes is a continuing trespass); *Gordy Const. Co. v. KHM Dev. Co., Inc*., 197 S.E.2d 426, 429 (Ga. Ct. App. 1973) (trespass continues every day sewer line and structures wrongfully remain without any authority or payment); *Hegg v. Hawkeye Tri-County REC*, 512 N.W.2d 558, 559-60 (Iowa 1994) (stray voltage is continuing trespass); *Joseph A.*

Here, Level 3 maintains that the installation of the cable was proper because it serves a railroad purpose.  If Union Pacific had installed fiber-optic technology solely for its own use in the safe and efficient operation of the railroad, there may be no trespass.  However, the trespass at issue in this litigation arises from the improper commercial use of the cable by Level 3, which is not a necessary or inevitable result of an installation for railroad purposes and which is completely abatable.  Thus, the Level 3 trespass here is continuing.

The continuing -- and non-permanent -- nature of this trespass is further shown by the changing and uncertain nature of the use of the railroad right of way purportedly granted to Level 3 under the Agreement with Union Pacific.

- Level 3's use of the right of way was expected to wax and wane with its changing use, and its payments and right to remain on the right of way would also wax and wane.  1998 Agreement at §§ 2(c), 18.

- The terms and conditions of the 1998 Agreement make Level 3's occupation of the right of way that of the railroad's lessee, not that of a permanent owner.  Ex. B to 1998 Agreement.

---

*Neyrey, Gen. Contractor, Inc. v. La. Power & Light Co.*, 347 So. 2d 266, 267 (La. Ct. App. 1977) ("[A] trespass committed by illegally erecting a structure on immovable property continues as long as the offending object remains on the premises, and the trespass is terminated only by the removal of the object wrongfully placed there."); *Jacques v. Pioneer Plastics, Inc.*, 676 A.2d 504, 507 (Me. 1996) (distinction between continuing or permanent trespass is whether the trespass is abatable); *Ward v. McGlory*, 265 N.E.2d 78, 80 (Mass. 1970) (transmission of electric current across land a continuous trespass, notwithstanding fact that defendant did not install wires or poles.  Further, it "is not necessary that the electric current cause damage to or come in contact with the land."); *N. States Power Co. v. Franklin*, 122 N.W.2d 26, 31 (Minn. 1963) (whether a trespass is continuing or permanent depends on the character of the invasion and the structures erected); *Cacioppo v. Sw. Bell Telephone Co*., 550 S.W.2d 919, 925 (Mo. Ct. App. 1977) (maintenance of a junction box at apartment building a continuing trespass); *509 Sixth Ave. Corp. v. N.Y. City Transit Auth.*, 203 N.E.2d 486, 488 (N.Y. 1964) (continuous trespass where subway structure encroaches on property); *Butler v. Lindsey*, 361 S.E.2d 621, 624 (S.C. Ct. App. 1987) (unauthorized use of land); and *Fradkin v. Northshore Util. Dist.*, 977 P.2d 1265, 1270 (Wash. Ct. App. 1999) ("A trespass is abatable, irrespective of the permanency of the structure involved, so long as the defendant can take curative action to stop the continuing damages.").

- Level 3 pays rent every year for the fiber-optic cable it uses for non-railroad purposes, and the rent increases every five years based on agreed indices.  1998 Agreement at § 2 (c).

- Level 3's occupation is "subject and subordinate to" Union Pacific's right to relocate tracks, fiber lines, pipe lines and other facilities where Level 3 has installed its fiber-optic system.  *Id.* at § 1 (c).

- Union Pacific can require Level 3 to move its system, including moves that would require abandonment. *Id.* at § 12.  Any relocation of the fiber system to another location in the corridor is subject to both Union Pacific's approval and availability. *Id.* at § 12 (d).  (Significantly, since different property owners often own the opposite sides of the right of way, a shift from one side of the center line to the other would stop the trespass on one landowner's property and start a trespass on his neighbor's land.)

- Upon Level 3's termination of its use of a portion of the corridor, it is *required* to execute necessary documents to transfer its rights of occupancy back to Union Pacific. *Id.* at § 18.

- Level 3 cannot assign or sublease its rights under the 1998 Agreement without Union Pacific's written consent.  *Id.* at § 26.

Level 3 maintains that its wrongful use cannot be considered a trespass under *Mock v. Potlatch Corp.,* 786 F. Supp. 1545 (D. Idaho 1992), because its use of the fiber-optic system is not a physical invasion and does not cause substantial injury.  Level 3 Br. at 28.  The claims in *Mock* were at base claims for nuisance – noise from a neighboring plant.  *Mock*, 786 F. Supp. at 1546.  There was simply no physical presence on the property where the trespass was claimed.  A landowner's right to control the use of his property was not at issue.  Here there is a tangible presence on the Plaintiffs' and Class Members' property – the cable.  In addition, the Plaintiffs are not suffering from a nuisance created by Level 3, but instead complain that Level 3 has infringed on their right to control their property and exclude others from it – rights that are fundamental to property ownership and trespass actions.

39

Level 3 also relies on decisions by other courts under other states' law to support its contention that its continuing use is not a continuing trespass.[22]  Different results can, of course, obtain under other state law.  Faced with a similar catalogue in a trespass case, the Kansas Supreme Court stated that: "We find none of them to be germane except perhaps to demonstrate that the law governing trespass is not static."  *Gross v. Capital Elec. Line Builders, Inc.,* 861 P.2d 1326, 1329 (1993) (trespass action can be maintained where defendants used plaintiffs' vacant lot, causing no damage, but paying no rent).   There are, however, points of distinction to the cases Level 3 cites in addition to the fact that the decisions speak to the law of other states.

Four of the cases cited by Level 3 involved the issue of whether claims against MCI had been discharged by its bankruptcy.  The standard applied in bankruptcy cases is different.  For instance, the Second Circuit in *In re Worldcom, Inc.*, 546 F.3d 211, 220 (2d Cir. 2008) found that under Kansas law the continued presence of MCI's cable could give rise to a claim of a continuing trespass.  Still, it found against the landowner because:

> Nevertheless, even assuming that MCI committed a continuing trespass, any such claim was discharged by confirmation of MCI's plan of reorganization, due to the expansive scope of the Bankruptcy Code's definition of "claim" and [the plaintiff's] failure to allege any relevant post-confirmation conduct or unforeseeable damages.

*Id.*  Other cases decided in the context of the MCI bankruptcy reach the same result.  *See Int'l Paper Co. v. MCI Worldcom Network Servs., Inc.*, 442 F.3d 633, 636-37 (8th Cir. 2006); *West v. Worldcom, Inc.*, No. 06 Civ. 0748(WHP), 2007 WL 3407060, at *4 (S.D.N.Y. Nov. 14, 2007).  *But see Gordy Const. Co., v. KHM Dev. Co, Inc.*, 197 S.E.2d 426, 429 (Ga. Ct. App. 1973)

---

[22] Level 3 Br. at 26-28 (cited cases governed by law of Arkansas, Georgia, Kansas, Mississippi, North Carolina, and Texas).)  Compare to cases in other states finding a continuing trespass, *infra* at note 21.

(continued existence of sewer line without an easement was a continuing trespass).  The same reasoning was followed by the Seventh Circuit in *Peeler v. MCI, Inc.*, 447 F.3d 992, 993 (7th Cir. 2006) to conclude that the bankruptcy discharge barred a trespass claim based on the original installation of cable on land not used for a railroad, but it left open the question whether a trespass action would remain for future entries to repair existing cable.  *Genenbacher v. Centurytel Fiber Co.,* 500 F. Supp. 2d 1017 (C.D. Ill. 2007) is another bankruptcy case.  In it the court found that under Illinois law it was possible that the cables would be classified as a continuing trespass.  *Id*. at 1020.  However, the court found a split of authority and decided to find the trespass was permanent.  *Id*.  It did not dismiss trespass claims related to the defendant continuing to come on the property to service the cable.  *Id*. at 1020-21.

Three of the cases cited by Level 3 involve the application of a North Carolina statute on suits against utilities, not common law on continuing and permanent trespass.  *See Gasperson v. Sprint Commc'ns Co.*, No. 96-1940, 1997 WL 770931, at *1 (4th Cir. Dec. 16, 1997); *Kirkman v. Norfolk S. Ry. Co.*, No. 1:01CV00850, 2006 WL 544303, at *2 (M.D.N.C. Mar. 6, 2006); *Curtis v. Norfolk S. Ry. Co.*, No. 1:01CV00869, 2003 WL 1965467, at *1 (M.D.N.C. Apr. 11, 2003).  Similarly, *Johnson v. Kan. City S. Ry. Co.*, No. 05-60372, 2006 WL 3371772, at *2 (5th Cir. Nov. 21, 2006), turned on the application of a Mississippi statute and contains no discussion of continuing versus permanent trespass.

Here, it is Level 3's arrogation to itself of the right to use the plaintiffs' property for commercial telecommunications purposes that is the trespass under Idaho law.  This use can be stopped at anytime.  Stopping the trespass does not require removal of the fiber, which could be restricted to use by Union Pacific solely for the safe and efficient operation of the railroad.  By contrast, in *Kroeger – on which Level 3 principally relies –* the trespass was due to the physical

presence of the railroad trestle.  Union Pacific, from whom all Level 3's rights derive, ensured in its contract that Level 3 had no permanent right to occupy any particular portion of the right of way -- or to occupy the right of way at all.  If Level 3 does not have rights of permanent occupation on a particular location, its trespass cannot be considered permanent.

**B.    Level 3's Unjust Enrichment Is Continuing**

Level 3 requests summary judgment against all Class Members who did not own at the time of the installation strictly on the basis of its view of the nature of the trespass claim.  In Count VI of their Complaint, however, Plaintiffs also assert an Unjust Enrichment cause of action.  Level 3 has not requested summary judgment on this count with respect to Class Members who did not own at the time of the installation and it has no basis for doing so.  *See, e.g., Lutyen v. Ritchie,* 218 P. 430, 432 (Idaho 1923) ("[W]here land is occupied without any express agreement as to the compensation to be paid therefore, there is an implied agreement that the person so occupying and using the land will pay therefore the fair and reasonable value of such use and occupation.").

## CONCLUSION

For the reasons stated herein, Level 3's various arguments in support of its motion for summary judgment are baseless and the motion should be denied in its entirety, effectively granting partial summary judgment to the class.

Dated:  October 29, 2010          **ZELLE HOFMANN VOELBEL & MASON LLP**

/s/Dan Millea
Dan Millea
500 Washington Avenue South
Suite 4000
Minneapolis, MN  55415
Telephone:  (612) 339-2020
Facsimile:  (612) 336-9100

-- AND --

/s/Brad P. Miller
Brad P. Miller
**HAWLEY TROXELL ENNIS & HAWLEY LLP**
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone: (208) 344-6000
Facsimile: (208) 342-3829
Email:  bpm@hteh.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

| | | |
|---|---|---|
| Joseph E. Jones | - | jjones@fslf.com |
| Stephen R. Thomas | - | srt@moffatt.com |
| Tyler J. Anderson | - | tya@moffatt.com |
| William T. Gotfryd | - | wtglawproj@aol.com |

/s/Dan Millea
Dan Millea, Attorney for Plaintiffs

44

349360v3